## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 7 |
| RACING SERVICES, INC., | ) | |
| | ) | Case No. 04-30236 |
| Debtor. | ) | |

### RULING ON CLAIMS

Three claims came before the Court for trial in Fargo, North Dakota.[1] Michael Raum, Steve Kinsella, and Bruce Schoenwald appeared for Creditor Susan Bala. Martin Foley and Leanna Anderson appeared for Creditor PW Enterprises, Inc ("PWE"). Joel Fremstad appeared for Creditor Robert Carlson. Jonathan Fay and Patrick Sinner appeared with and for Kip Kaler as Chapter 7 Trustee. The Court heard evidence and arguments. The parties requested delay in filing post-trial briefs in order to have a full transcript. By agreement, the briefs were not submitted until late March 2018. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

### STATEMENT OF THE CASE

The three claims before the Court for determination arise in a very unusual context. More than eleven years after this case was filed, the State of North

---

[1] The Honorable Thad J. Collins, Chief Bankruptcy Judge for the Northern District of Iowa, sitting by designation.

Dakota was ordered to return millions in taxes it collected from Debtor Racing Services, Inc.'s ("RSI") activities.  The bankruptcy estate now has funds to pay all or a substantial portion of creditors' claims.

After this money came back to the estate, PWE, the largest remaining creditor, filed an amended claim asserting its right to the majority of that money. Robert Carlson, another creditor, made a similar argument, albeit for a much smaller amount.  Both of these creditors assert they had oral rebate agreements with RSI and under those rebate agreements the tax money returned to the estate should be paid to them.  Susan Bala, sole owner of RSI, objects to PWE's and Carlson's claims.  She argues that PWE and Carlson have already received all they bargained for in the oral rebate arrangements.   She argues the tax money should go for general distribution on unsecured claims and then to her as sole owner of RSI.

Bala has also recently filed her own unsecured claims.  She seeks indemnification for legal fees she paid in defending criminal charges against her related to her work at RSI, indemnification for legal fees she incurred seeking payment on a lease she had with RSI, and reimbursement for the value of a life insurance policy that was surrendered as a part of her now-reversed criminal conviction.  PWE and Trustee object to Bala's claims.

**FINDINGS OF FACT**

## I.    Background

The Court begins its fact-finding by reciting some critical, relevant history

of these proceedings.  This history forms the context for these claim disputes, the

background for the parties' arguments, and a major basis for the Court's ultimate

ruling.

RSI filed this bankruptcy in 2004 after both RSI and Bala came under

criminal investigation and eventual indictment on federal charges.  The State of

North Dakota filed a claim against RSI for unpaid taxes.  PWE, as an interested

party, filed an objection to North Dakota's claim.  PWE argued the North Dakota

statute the State relied upon for its claim did not authorize the tax on account

wagering.  N.D. Cent. Code § 53-06.2-11.  In the 1980's, the North Dakota

legislature added N.D. Cent. Code § 53-06.2-10.1, allowing "simulcast" horse

betting.  The legislature, however, did not amend N.D. Cent. Code § 53-06.2-11—

providing for taxes on horse racing—to specify that the taxes were also applicable

to simulcast and account wagering activity.  That amendment did not happen until

2007—long after the betting relevant to this case occurred.  Before 2007, N.D.

Cent. Code § 53-06.2-11, on its face, addressed only live horse racing.

This Court first ruled on PWE's objection to the State's tax-based claim in

2010.  PW Enters., Inc. v. North Dakota (In re Racing Servs., Inc.), Bankr. No. 04-

3

30236, Adv. No. 06-7020, 2010 WL 5376222 (Bankr. D.N.D. Dec. 22, 2010).
The Court ruled that the tax was applicable to simulcast and account wagering and granted North Dakota summary judgment on PWE's objection to its claim. Id. at *8.

In 2012, a different but related issue came before this Court for trial. PW Enters., Inc. v. North Dakota (In re Racing Servs., Inc.), 482 B.R. 276 (Bankr. D.N.D. 2012). There, PWE, acting in a trustee-like role on behalf of the bankruptcy estate, sought to claw back tax money collected by North Dakota from RSI. PWE argued several theories for the recovery, including that the State improperly collected tax on simulcast horse racing. This Court again ruled for North Dakota on the tax issue, as well as numerous other issues, and dismissed the claw back complaint. Id.

PWE appealed that decision to the United States District Court for the District of North Dakota. The District Court reversed this Court's holding on the taxation issue. PW Enters., Inc. v. North Dakota (In re Racing Servs., Inc.), 504 B.R. 549 (D.N.D. 2014). The District Court found that North Dakota "was not authorized to collect taxes on account wagering during the time period in question." Id. at 557.

North Dakota appealed the District Court's ruling to the Eighth Circuit Court of Appeals, which affirmed the District Court. PW Enters., Inc. v. North Dakota

4

(In re Racing Servs., Inc.), 779 F.3d 498 (8th Cir. 2015). The Eighth Circuit found that "the unambiguous statutory language did not authorize the taxes the state collected on account wagering." Id. at 507. The Eighth Circuit then "remand[ed] to the bankruptcy court for the calculation of the amount of unauthorized taxes the state must return to the bankruptcy estate." Id.

Following the Eighth Circuit's ruling, the RSI bankruptcy estate reached a settlement with North Dakota on the amount of tax funds to be returned. The Court approved that settlement on December 20, 2017, over the objection of Susan Bala. North Dakota paid the bankruptcy estate $15,872,000.00 under that settlement. With that procedural background and recent factual developments as context, the Court now turns to its findings of facts on the evidence presented at trial.

## II. Bala, Formation of RSI and Purpose

Susan Bala is the sole owner of RSI and a central figure in all these claim issues. She grew up in Fargo, North Dakota. She became involved in the horse racing industry in 1988, a year after North Dakota passed legislation allowing wagering on live horse races. The State asked her to develop a feasibility study on the horse racing industry and how the State could generate revenue from horse racing. The study concluded that, in order to have a sustainable horse wagering industry in North Dakota, there needed to be a network of off-track betting

5

locations, not just live race wagering.  Because of that study, North Dakota

eventually passed legislation allowing off-track betting.

Bala then decided to start a company called Dakota Race Management.  Her

company competed for and obtained a license to become involved in horse race

betting.  She later started another company that would participate in the horse race

betting industry in North Dakota—Racing Services, Inc. ("RSI"), the Debtor in this

case.  Bala is president and CEO of RSI.  Bala owns RSI through RSI Holdings, a

company she owns outright.

RSI became the simulcast operator for off-track horse race betting in North

Dakota.  RSI would eventually distribute video of live horse racing from around

the United States to players at off-track betting sites.  RSI had authorization and

contractual rights to take bets and to transmit those bets into the on-track betting

pools.  It also had the authorization to provide all accompanying services: satellite

signals, data links, betting pool reconciliations, and other services necessary for

off-track betting.

RSI's customers were the players—the bettors on the races.  RSI would

provide the race signal to them, take their bets, and transmit their bets into the

betting pools for the races.  RSI generally had two kinds of customers: (1) regular

players, members of the public who would go to a teller and place their bet; and (2)

professional players, who bet in high volumes.

6

Professional players generally did not want to stand in line and place their bets at the teller window.  Instead, these players sought special accommodations for their operations and the high number of bets they played.  Some professional players approached RSI seeking out those accommodations.  Generally, the professional players were looking for a private space with private tellers to place their bets.  Some players wanted to tape the races or wanted an office within RSI's facility where they, or their agent, could place bets through RSI.  In addition, they often wanted information services or computer services to aid their betting.  Most importantly, these players wanted to be able to play more than one track at a time.  They wanted a full menu of the tracks RSI had available and would pick betting pools where they wanted to play.

At first, RSI did not specifically compete for professional players.  As time went on, however, it became clear that professional players were a large potential market for bets.  RSI began to compete with other simulcast providers for the business of these professional players.

RSI made its money through what is called the "takeout" or "retainage."  This is an amount that service providers like RSI were allowed to "takeout" of the betting pool as their compensation.  The takeout was effectively RSI's gross revenue.  The takeout for each betting pool varied.  The jurisdiction of the race, the particular racetrack, and the type of bet made all had an effect on the takeout

7

percentage.  Those factors thus had an effect on RSI's gross receipt.  The takeout

percentage available to RSI (and other service providers) would vary from 15% to

26%.  The exact takeout amount was and is set by statute in each jurisdiction for

the type of bet made.

RSI used the takeout to pay track fees, tote fees, taxes, rent, payroll, signal

costs, and other RSI costs and expenses.  After paying these fees, taxes, and other

expenses, any money left in the takeout would be RSI's profit.  After the service

provider (like RSI) removed the takeout, the money remaining in the betting pool

was the "purse" for which the players played.  The purse is short-hand for the

amount that stands to be won by a player, or players, who place winning bets.

In addition to normal business payroll and corporate income taxes, RSI paid

taxes to the State of North Dakota that were unique to the pari-mutuel horse racing

involved here.  The taxes were calculated based on the "handle", which was the

total amount of money that passed through RSI in the form of bets.  It is called the

"handle" because it is the amount of money the service provider "handles" in

taking all the bets.  RSI paid the State of North Dakota taxes on all wagers that

came through its North Dakota operation.  The tax rate was approximately 3.7% or

3.8% of the handle but could vary some depending on the particular pool involved.

Here, both claimants, PWE and Carlson, bet on horse races using a system

called "account wagering."  In that system, the player sets up an account with the

service provider, in this case RSI, from which the player made wagers. RSI debited out of this account for wagers placed and deposited any winnings back into that account. RSI placed the player's bet into the on-track betting pool. If the player won, RSI immediately paid the winnings to the player's account. Then, each month, RSI would settle with the tracks for the amounts RSI paid out on winning wagers from that track. This system eliminated the need for physical cash or bank transfers with every wager and payout, saving high-volume players time and transaction costs.

Professional players eventually became highly desirable for RSI because of their large volume of bets. The more volume in betting, the more takeout RSI would get. As a result, RSI—like many betting service providers all over the country—began offering special benefits to high-volume players. These special benefits included free stays at hotels, free dinners, and tickets to events. The competition for professional players eventually led betting operators like RSI to offer "rebates" from the provider's own takeout as an additional benefit to professional players. The rebates were usually a percentage of the service provider's takeout for the bets attributable to the professional player. Rebating gave the professional player money back—win or lose. Essentially, the betting provider would agree to give back a portion of the profits it made from a particular bettor in order to incentivize that bettor to continue using the provider's services.

The practice of rebating began sometime around 1995. At that time, rebates were usually 5%. This meant, if a professional player bet $100, he or she would receive a $5 rebate, win or lose. The 5 percent came directly out of the betting operator's takeout for the bets the player made. For betting service providers like RSI, the rebating had to be carefully figured so that the provider would not end up losing money with each bet. For example, if the service provider agreed to a 10% rebate with a professional player, in a pool offering only a 15% takeout for the service provider, that would leave only 5% for the service provider to pay the fees, taxes, and other operating expenses. If the service provider's expenses exceeded the 5% remaining in the takeout, it would be operating at a loss as to that player, which could add up to a substantial amount of money. Service providers had to come up with formulas to offer competitive rebates to players, while still making a profit.

RSI began offering rebates to professional players in 1997. David Cuscuna was the first professional player who received a rebate with RSI. Mr. Cuscuna testified at trial about rebating in the horse race betting industry, his relationship with RSI, the way they structured the rebates, and the way the rebating generally functioned for all parties involved.

RSI did not initially offer flat rebates for the entire volume of bets a professional player made. Instead, RSI used different rebates depending on the

10

pools where the player made their bets.  In pools with higher takeout percentages

for RSI, the rebate to the player would be higher; and in lower takeout pools, it

would be lower.  Players generally did not worry about the specifics of the pool,

because they did not have to pay expenses out of the takeout like the service

provider did.  Instead, the professional players looked for an effective rate—an

average rebate rate—that the player could achieve over all the different types of

bets the player made.

  To accommodate the various factors involved, RSI and each player

negotiated their own unique rebate agreements.  RSI had different rebate

arrangements with each player based mainly on the takeout percentage available to

RSI and the professional player's desired rebate percentage on all of that player's

bets.  Generally, a professional player would approach RSI seeking a set rebate

rate.  RSI would then look at the volume, the tracks, and the various pools that

professional player normally played.  Based on those variables, RSI would

calculate the rebate it could afford to offer.  Usually, the professional players

would tell RSI that they were receiving a particular percentage rebate from another

service provider and seek a similar or higher rebate if they played through RSI.  In

addition, RSI would look at the other special services the particular player was

requesting, such as office space and data connections, and the cost of those

services.  RSI would then make a decision about the rebate percentage it could offer to that particular player and still make money for its business.

The deals RSI made with professional players were all oral, handshake deals.  There was no specific term or continuing obligation for either side.  The player did not commit to continue playing with RSI or even maintain a specific volume of bets.  RSI, likewise, was under no obligation to continue to take the player's bets and could cancel or request to renegotiate the rebate agreement going forward at any time.  The many constantly evolving conditions made these agreements provisional by nature.  It was understood that either side could stop participating at any time.

Around 2001, RSI was generally offering professional player's rebates between 8% and 11%.  RSI did not advertise these rates.  RSI and the player would work out rebates privately that each side felt was fair for their particular circumstances.

### III.   RSI's business with PWE

In early 1999, Bala met with Peter Wagner, owner of PWE, in Las Vegas. Wagner told Bala that he was a high-volume computer player.  He told her the off-track service provider he had been using cut him off from play because he used a computer algorithm to decide what bets to place.  This computer algorithm helped PWE decide what bets to place by calculating what bets, if successful, would have

the highest rate of return. Wagner was looking for a new venue for PWE to place its bets.

Around that time, many racetracks were concerned about high-volume players taking part in their betting pools. In particular, they were concerned with players who used computer programs to decide what bets to make. Many tracks and service providers were uncertain about how these professional, computer bound players affected other bettors, and the track or service provider's bottom line. Computer players were seen by many in the industry as having an advantage over regular players. Wagner wanted to know from Bala if he would be welcome to continue his computer betting at RSI. Wagner told Bala that he had been receiving an 11% rebate with his previous provider. He was hoping to achieve a similar rebate with RSI, as well as some other accommodations.

After his meeting with Bala in Las Vegas, Wagner visited RSI's office in Fargo. During that visit Wagner discussed the accommodations he was seeking at RSI. In particular, he was looking for a private space within RSI's office where he could set up PWE's computer systems and accounting support. Wagner and Bala then negotiated, and eventually reached, a rebate and facilities usage agreement. Wagner agreed to place PWE's large volume of bets through RSI. RSI agreed to pay a weekly rebate to PWE. That rebate almost always came to around 11%.

13

The parties here agree that they had a valid oral rebate agreement.  They also agree about the general terms and concepts involved in that oral agreement.  They agree it was a verbal agreement and that the best evidence of the items included in the agreement came from PWE's Exhibit 3.  That exhibit was a set of weekly statements that recorded the total handle from PWE, total retainage (the takeout) on the handle, taxes on PWE's wagers, expenses of RSI, RSI's fee, other miscellaneous fees, and the amount paid to PWE as a rebate.  PWE received a sheet like this for each week that it placed bets through RSI.  This sheet thus accurately reflects the elements of the financial arrangement between RSI and PWE.

The parties disagree, however, about how their oral agreement affects entitlement to assets currently in the bankruptcy estate.  In particular, the parties dispute whether and how the rebate agreement applies to the money that the State of North Dakota improperly required RSI to pay as a tax on betting activity RSI handled.  The parties, in other words, disagree on what their oral agreement said about the money the State has returned to the RSI bankruptcy estate, which totals $15,700,000.

Both PWE and RSI assert that under the terms of their oral rebate agreement, they were entitled to all remaining money after the other party got the percentage they were limited to under the oral agreement.  RSI believed PWE was

14

limited to an 11% rebate and RSI got the remaining. PWE believed RSI was limited to a 1% management fee and its expenses, and PWE got the amount remaining. This is how things apparently worked out from each party's perspective during the agreement. Both provided testimony seeking to explain and characterize the terms of the oral agreement and the meaning of the items in the weekly sheets (Exhibit 3) in their favor. Wagner testified that the RSI-PWE agreement gave RSI only its costs and a 1% additional management fee. Wagner claimed the any remaining money would be rebated to PWE. Bala, on the other hand, testified that the PWE-RSI agreement intended to net PWE a rebate of approximately 11% each week. She testified they reached this number through a formula that relied upon a floating cost percentage reflecting her actual cost for particular PWE betting. The percentage was usually around 9.5%. Bala testified the "1% RSI fee" on the reconciliation sheet was used as a convenient way to keep the ultimate rebate to PWE averaging out to 11%. The 1% RSI fee also could be seen to represent or account for services RSI provided for PWE such as computer and accounting space.

RSI and PWE successfully did business together under this oral rebate agreement for several years. PWE never disputed the calculations on the weekly reconciliation sheets or expressed dissatisfaction with the arrangement. RSI also proceeded with the agreement without incident. Both parties were making money

15

on PWE's betting and generally had a successful business relationship.  In total,
RSI paid $31,550,835.45 in rebates to PWE.

The Court finds that the oral rebate agreement between RSI and PWE
simply did not address or provide for the event that actually occurred here: the
return of a large sum of money previously paid as taxes to the State long after the
parties' contractual relationship was over.  The Court finds that the express terms
of the rebate agreement do not address this situation.  The Court further finds that
none of the testimony offered on the meaning or intent behind the oral agreement
persuasively establishes either parties' position.  The event that occurred—a future
court holding that the tax at issue was not authorized under North Dakota law and
an accompanying order that North Dakota return the money to RSI, which
amounted to millions of dollars—was unexpected and not considered by the parties
in making these rebate agreements.

The Court finds additional evidence in the record is helpful to understand the
PWE-RSI arrangement better.  In particular, evidence regarding business RSI and
PWE did together in another jurisdiction.  This business arrangement resulted in a
different oral rebate agreement there and sheds some light on the meaning of the
North Dakota agreement at issue here.

RSI and PWE started a betting location in Nuevo Laredo on the Texas
border.  This location was not subject to the 3.8% tax RSI was paying in North

16

Dakota.  Since RSI was not paying these taxes, the amount of the takeout

remaining after paying expenses was larger.  Thus, RSI had more funds available

to could negotiate with.  That additional money could have been allocated in either

RSI or PWE's favor under this new oral agreement.  The evidence is undisputed

that RSI and PWE negotiated a new oral rebate agreement when faced with this

lower tax environment.  They eventually agreed that RSI would get one-third, and

PWE would get two-thirds of the additional money.

There were weekly reconciliation sheets (like PWE's Exhibit 3)

documenting the numbers involved with rebating at the Nuevo Laredo office.

These Nuevo Laredo reconciliation sheets were basically the same as those in

North Dakota, except they did not treat tax as an expense of RSI and divided the

additional 3.8% of the handle available between RSI (1/3) and PWE (2/3) as they

agreed in negotiation.  The Court finds that the Nuevo Laredo agreement vividly

demonstrates that the then existing rebate agreement between RSI and PWE in

North Dakota did not consider the possible return of taxes paid out of the takeout.

If it had, it almost certainly would have been adopted and used in Nuevo Laredo.

Simply put, when the parties faced the exact scenario that we face now—no state-

level tax at the new office in Nuevo Laredo—they went back to the negotiating

table and struck a new deal.  The Court finds the parties also would have

renegotiated North Dakota if the tax was struck down during their operating

relationship. The existing agreement would not have been applied or otherwise seen as having addressed the issue already.

A second piece of evidence also sheds some light on the meaning of the North Dakota PWE-RSI agreement. It is undisputed that RSI provided special accommodations to PWE, allowing its computers to place bets directly into the RSI system. RSI helped PWE avoid going through a teller and dealing in physical currency, which allowed PWE to increase bets and winnings. Most importantly, it allowed PWE to bundle bets and place bets on the last cycle with the final odds. As a result, PWE's large bets were not going to show up in time to change the odds. PWE bet as close to post as possible, which was highly advantageous for PWE. RSI also assisted PWE by advocating within the industry in favor of PWE's controversial computer playing. RSI worked with various lawyers and others to advocate for PWE's play, which kept PWE's business model working. The testimony thus strongly suggested that the "1% RSI fee" in the reconciliation sheets reflected PWE's acknowledgement of RSI taking care of PWE's additional needs and advocating for PWE's computer play in the industry.

The Court finds all this evidence undermines PWE's argument that the "1% RSI fee" was all RSI was to get under the North Dakota agreement no matter what occurred. This evidence shows the North Dakota agreement more likely than not intended to treat RSI better than PWE suggests. The evidence suggests quite

18

clearly that the parties would have likely renegotiated their deal, rather than relying on the existing oral agreement, in the event that a larger sum of money suddenly became available to them.

### IV.    RSI's business with Carlson

Robert Carlson also gambled professionally through RSI.  He began betting on horse racing with RSI in July 1999.  Before he started with RSI, Carlson also met with Bala in Fargo.  He received a projection sheet on annual rebates and a list of tracks showing the takeout percentages for bets placed at each track.

Carlson and RSI eventually came to an oral rebating agreement.  They agreed to different terms than RSI and PWE.  They agreed RSI would rebate between 9–11% of Carlson's weekly handle depending on what betting pools Carlson entered that week.  RSI agreed to pay all taxes, track fees, and other miscellaneous fees and keep any remainder as profit.  Carlson testified to a different agreement than Bala did.  He suggested Bala agreed to keep 3.5% out of the takeout, pay all fees, taxes, and expenses and give the rest to him.  His testimony lacked detail and credibility and the Court finds there is even less evidence in the record to support Carlson's version than for the version offered by PWE.

Carlson's argument, however, is not primarily based on the terms of his rebate agreement with RSI.  Instead, Carlson notes that he complained to Bala

19

about his rebate and requested a bigger rebate.  Carlson said Bala told him that she was working on getting the North Dakota taxes reduced.  She told him that if she were able to do so, she would be able to increase his rebate.  Carlson admits taxes were not reduced at all before RSI ceased operations.

Bala did not disagree with Carson's testimony about their discussions of a lower tax rate and potential increase in his rebate amount.  Bala agreed that RSI in fact intended to give Carlson a larger rebate if taxes changed.  Bala noted, however, that the taxes never got reduced during the agreement.  Carlson nevertheless argues that he understood this conversation to mean that Bala and RSI intended to give him whatever amount of tax reduction they got.  Carlson believes this means that he should get the full amount of the unauthorized tax money returned to the estate attributable to his bets.  Bala testified that they would have renegotiated—and Carlson would have gotten a better agreement—but would not have gotten all tax money.

Carlson also asserted that he was the actual taxpayer.  It was his understanding that this tax was like a sales tax, which the customer pays, but the vendor is responsible for collecting and remitting to the state.  Carlson testified that, because he paid the tax, he is entitled to the return of the tax.  Bala testified she paid the tax and was under a legal obligation to do so.  The Court finds Bala's testimony to be credible on all points dealing with her agreement with Carlson.

### V.    Bala's Claims

Bala has recently made her own personal claims as an unsecured creditor against the RSI estate.  These claims are in addition to the 100% ownership interest she has in RSI—which has a lower distribution priority than unsecured claims. Bala makes three claims: (1) indemnification for attorney's fees she paid defending herself against the criminal charges related to her work for RSI; (2) indemnification for attorney's fees she paid for her attempts to get RSI to pay her rent for the space RSI occupied under a lease in a building she personally owned; and (3) the damages she sustained for the improper termination of her life insurance policy through RSI after the RSI bankruptcy was filed.

As background for these claims, Bala testified at length about the financial hardship she suffered because of her wrongful conviction and loss of her business income.  In 2002, Bala was earning about $160,000 a year as the president and CEO of RSI Holdings, Inc. and RSI.  She owned residential real estate.  She also owned commercial real estate at 901 28th Street South, Fargo, North Dakota that she leased to RSI for its offices.

Bala also had a Guardian life insurance policy with a death benefit of $1,000,000 through RSI.  RSI had been paying the premiums on this policy as part of her compensation.  This life insurance policy meant that, in the event of Bala's

21

death, her estate would receive $1,000,000. Her policy had two components, a base $500,000 whole life policy with an additional term policy of $500,000.

In 2003, RSI had grown to a company with 20 employees with a total payroll of over $1 million. Bala's personal net worth was about $20 to $25 million. The majority of this value was from her ownership interest in RSI as an operating business.

In 2003, RSI came under criminal investigation. In April 2003, the FBI arrived at RSI's office and searched it. Bala did not initially know what the investigation was about. It turned out to be about RSI's licensing for a second betting site Bala had been operating. As a result of that investigation, both RSI and Bala were criminally indicted on December 10, 2003. The Court appointed a receiver for RSI. Bala no longer received a salary from RSI, but still held her ownership interest.

In 2004, RSI filed this bankruptcy. Bala, along with the board of RSI, decided this was the best course of action. This decision was intended to protect the company from a serious decline in value under the receiver.

From the time of her indictment to trial, Bala had no real ability to get income. Instead, she spent most of her time and energy working on her legal defense. She also took care of her ailing brother. She did not receive a paycheck during this entire time period. The criminal case against her received substantial

press coverage that affected her deeply.  She hired a lawyer who she paid out of her savings at first and then from the sale of assets, like the two homes she owned.

Bala also sold the commercial property where RSI rented office space.  Bala was not able to sell the property initially because the Bankruptcy Trustee was occupying the building and refused to leave.  The Lease was eventually rejected by operation of the Bankruptcy Code.  This occurred on October 13, 2004.  RSI continued to occupy the office building at the direction of the Trustee until Ms. Bala sold the building on December 10, 2004.  RSI did not pay Bala any rent during this time.

Bala eventually filed an application for administrative expense for the back rent from RSI.  After substantial litigation and an appeal, the Trustee was ordered to pay Bala $109,000 in back rent.  Bala incurred substantial legal fees in pursuing this rent claim.

In January 2005, the criminal charges against Bala and RSI came to trial. The trial resulted in Bala's conviction.  She was sentenced to 33 months in prison. An order of criminal forfeiture for almost $20 million was entered against her.  RSI was also convicted.  The Court entered an order of forfeiture against it for over $99 million.  This amount reflected the total handle which RSI received at the additional betting location at issue—and failed to pay taxes on.  RSI lost much of its value in the time leading up to the trial.

The Eighth Circuit Court of Appeals eventually overturned Bala's conviction. Bala already had served almost 18 months in prison. While she was in prison, she sold her house to pay her criminal defense attorney. Her personal belongings were destroyed in a flood at a storage garage. Bala had almost no property when her conviction was overturned. While in prison, she had worked making $0.12 an hour cleaning and doing other labor, but she accumulated almost no savings. Bala stayed with family when she got out of prison. She had no income at all until 2007.

Bala lost the life insurance policy she had through RSI. It was canceled in 2007 when the U.S. Department of Justice caused Guardian to surrender the policy as a part of the criminal forfeiture proceedings. RSI stopped paying the premiums on the policy. When Bala looked at reinstating the policy in 2009 after getting out of prison, the past due amount on the life insurance was $28,906.41. Bala states that she did not have the funds to pay the reinstatement costs and premiums on this policy. Bala did not look for or otherwise attempt to obtain another life insurance policy.

Bala's inability to generate income to pay the policy was partly the result of her substantial health issues. In 2008, Bala was diagnosed with Meniere's disease which causes extreme vertigo, dizziness, nausea, vomiting, and fatigue. In 2010, she was diagnosed with ovarian cancer. She had a large tumor removed during

24

emergency surgery.  She had follow-up chemotherapy which she finished in 2011.
She has been cancer free since that time.

Bala's loss of income, health problems, and age made it more difficult for
her to obtain a life insurance policy of an equivalent value to the one she lost.
Even if an equivalent policy was available, the premiums would have been much
greater than her previous policy through RSI.  Bala also has been told she would
not qualify for life insurance until 5 years after she was cancer free.

David Cole testified for Bala on the life insurance issue.  He works selling
life insurance which he has done his entire career.  He is familiar with companies
using life insurance policies as a form of compensation for their executives.  He
testified that a collateral assignment split dollar policy, like the one Bala had while
she worked for RSI, incorporates a whole life policy in which the employer pays
the premiums for the employee, who owns the policy.  He testified about the
substantial cost to Bala to get a replacement policy.

Bala now works as the majority owner of an assisted living center.  The
center is currently expanding to provide care for autism spectrum adults.  She has
also started a management company and works to acquire technology companies.
She now has the ability to pursue her claims against the RSI bankruptcy estate with
counsel to assist her.

## CONCLUSIONS OF LAW AND ANALYSIS

There are three sets of claims before the Court.  PWE's claim, Carlson's claim, and Bala's claims.  PWE has claimed over $10 million based on its argument that it is entitled to receive the illegally collected taxes assessed on its betting activity.  Carlson makes a similar argument based on the taxes assessed on his betting activity.  Bala has made claims, on three different basis that total $1,303,594.18.  The Court addresses the claims separately.

### I.    PWE's Claim

PWE originally filed a claim for $2,248,100.86.  That amount is largely comprised of what was in PWE's wagering account with RSI at time of bankruptcy.  There are no pending objections to this claim and it is approved.  In 2017 PWE amended its claim to add $10,851,553.12 plus interest for "Improperly Collected Taxes."  Bala objected to this additional claim.  This additional claim is the amount in controversy here.

PWE believes it had paid tax as an assessment RSI made on PWE's account wagering activity.  PWE believes it should get that money back.  As noted, the Eighth Circuit affirmed an order of the United States District Court for the District of North Dakota declaring the taxes invalid under North Dakota law more than ten (10) years into the bankruptcy case.  The Eighth Circuit ordered the unauthorized taxes returned to RSI.  PWE's additional claim is for a large portion of that

returned tax money.  PWE's claim is based almost entirely on the rebating

agreement it had with RSI.

### A.  Burden of Proof

The Bankruptcy Code and Bankruptcy Rules specifically address burden of

proof on claims.  The Code provides:

> (a) A claim or interest, proof of which is filed under section 501 of this
> title, is deemed allowed, unless a party in interest. . . objects.
>
> (b) . . . [I]f such objection to a claim is made, the court, after notice and
> a hearing, shall determine the amount of such claim in lawful currency
> of the United States as of the date of the filing of the petition, and shall
> allow such claim in such amount, except to the extent that—
>
> (1) such claim is unenforceable against the debtor and property of the
> debtor, under any agreement or applicable law for a reason other than
> because such claim is contingent or unmatured. . ..

11 U.S.C. § 502.  Thus, once a proof of claim is filed it is prima facie evidence of

the claim's validity and amount, and the claim is deemed allowed if there is no

objection.  In re Tanner, Bankr. No. 12-01429, 2013 WL 2318848, at *4 (Bankr.

N.D. Iowa 2013) (citing In re Be–Mac Transp. Co., 83 F.3d 1020, 1025 (8th Cir.

1996)).  "If an objection to the claim is made, the court, after notice and a hearing,

must determine the amount of the claim fixed as of the date of the petition." Id.

"Bankruptcy Rule 3001(f) places the burden of producing some evidence to rebut

the presumption of validity on the objecting party."  Id. (citing In re Dove–Nation,

318 B.R. 147, 152 (B.A.P. 8th Cir. 2004)). "If this burden of production is met, the

ultimate burden of persuasion as to the allowability of the claim resides with the

creditor." Id. (citing Dove–Nation, 318 B.R. at 152; Be–Mac Transp., 83 F.3d at

1025 n. 3.).

PWE's claim is based on an oral rebate contract with RSI and in that claim,

PWE alleges the following:

> PWE's agreement with RSI, as evidenced by the Weekly Reports, was
> that out of the retainage, RSI would be paid a 1% fee on PWE's total
> handle. RSI was also authorized to deduct from the retainage certain
> expenses (listed on the Weekly Reports as "TeamMakers Site Expense"
> and "Racing Operations" expenses) and withhold certain fees and taxes
> (listed on the Weekly Reports as "State and Track Expenses"). The
> remainder of the retainage was credited to PWE as an incentive. RSI's
> fee was expressly limited to 1%. Accordingly, if any expense or tax was
> reduced, the incentive paid to PWE would increase by a like amount.

Claim No. 11-2.

Because PWE's claim starts with a presumption of validity, Bala needs to

"produc[e] some evidence to rebut the presumption of validity" of PWE's claim.

If she does so, the "ultimate burden of persuasion as to the allowability of the

claim resides" with PWE.  Bala testified that PWE's claim misrepresents the PWE-

RSI rebate agreement.  Bala asserted that PWE bargained for and received an 11%

rebate.  Bala notes that the 1% RSI fee was simply a mathematical device to

document this bargain.  Bala argues that the weekly rebate sheets showing the 1%

fee are a by-product of the agreement, but do not represent the agreement itself.

The Court finds this testimony is sufficient to be "some evidence to rebut the

presumption of validity." PWE has "the ultimate burden of persuasion as to the allowability of" its claims.

PWE presents three arguments to support its claim. First, PWE argues that RSI must return the money to PWE under the express and clear terms of their oral rebate agreement. PWE argues the plain terms of the agreement show the parties intended that RSI would receive 1% of the handle and its actual expenses and PWE would receive the remainder of the rebate money. PWE concludes that RSI has already received its 1% plus expenses, and the returned tax money should go to PWE as the agreement provided. Second, PWE argues that if the plain and express terms of the oral agreement do not persuade the Court, the Court should look to the extrinsic evidence, which PWE also believes supports its claim in full. Third, PWE argues that, even if the Court does not find in its favor under any interpretation of the contract, PWE is entitled to its full claim based on principles of implied or quasi contract and equity. PWE has the burden of proof on these issues.

### B. PWE's Rebate Contract Claims

In determining a claim's validity and enforceability, a court looks to governing substantive law. In re Ford, 125 B.R. 735, 737 (E.D. Tex. 1991), aff'd sub nom. Matter of Ford, 967 F.2d 1047 (5th Cir. 1992); In re Gridley, 149 B.R. 128, 132 (Bankr. D.S.D. 1992). Here, PWE argues that based on its oral rebating

29

contract with RSI it is entitled to return of the money initially paid to North Dakota as a "tax." The parties agree this is a North Dakota contract issue. PWE has the burden of persuasion to show a valid entitlement to the tax money under North Dakota contract law.

PWE argues that the oral agreement gave RSI a 1% fee as part of the expenses paid out of the takeout and PWE got everything else. The oral agreement treated taxes and other expenses as something RSI had to pay. When the taxes were later invalidated, PWE argues that the money returned to the estate should be treated as the remainder—beyond the 1% fee and expenses of RSI—to which PWE is entitled under the agreement. PWE essentially argues taxes were an expense charged, but ultimately not incurred, by RSI. Thus, when the tax money came back to the RSI bankruptcy estate, it should be treated as PWE's money to reimburse PWE for the improper "tax" expense RSI collected.

Bala disputes PWE's interpretation of their oral rebate agreement. Bala argues that the agreement only provided PWE an average effective rebate of 11%—as PWE requested. Bala argues RSI—not PWE—was entitled to everything remaining after paying PWE 11%. Bala argues that PWE already received this 11% rebate during the life of their contract, so RSI has completed its duties to PWE under the contract. The remaining money, according to Bala, is retained by

RSI because PWE has simply already gotten all it was entitled to under the rebate agreement.

The primary goal of contract interpretation is to give effect to the mutual intention of the parties as it existed at the time of contracting.  N.D. Cent. Code § 9-07-03; Nat'l Bank of Harvey v. Int'l Harvester Co., 421 N.W.2d 799 (N.D. 1988).  Contracts must be interpreted based on the parties' intentions at the time the contract was made and not based the parties' intentions as they exist afterwards.  Nat'l Bank of Harvey, 421 N.W.2d at 803.  "However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract."  N.D. Cent. Code § 9-07-13.

The North Dakota Supreme Court has described how these standards apply here in cases of an oral contractual agreement:

> The object of interpreting and construing a contract is to ascertain and give effect to the intention of the parties. The construction of a written contract to determine its legal effect is always a question of law for the court to decide. However, the interpretation of the parties' intentions as to the meaning of certain words or phrases in a written contract may involve either a question of law or a question of fact depending on whether or not the interpretation requires the use of extrinsic evidence. If the parties' intentions in a written contract can be ascertained from the writing alone, then the interpretation of the contract is a question of law for the court to decide. If, however, the parties' intentions cannot be determined from the writing alone and reference must be made to extrinsic evidence, then those questions in regard to which extrinsic evidence

is adduced are questions of fact to be determined by the
trier-of-fact.

We hold that the same general principles apply to a court's
interpretation of an oral contract. Obviously, however, the
terms of an oral contract can be established only through
extrinsic evidence. A determination of these terms, if they
are disputed, must therefore be made by the trier of fact,
and will be reversed by this court on appeal only if "clearly
erroneous." After the terms of the oral contract have been
determined, the issue of the parties' intentions, if
ascertainable from those terms, involves a question of law
for the court to decide, and will be reversed by this court
on appeal if erroneous. Yet, if the parties' intentions are
not ascertainable from the terms of the oral contract and
must therefore be established by extrinsic evidence, the
question once again becomes one for the trier of fact and
this court will reverse on appeal only if "clearly
erroneous."

Tallackson Potato Co., Inc. v. MTK Potato Co., 278 N.W.2d 417, 421–22 (N.D.

1979) (citations and quotations omitted).

   PWE makes its contract claim on two alternative bases.  PWE first argues

that the Court need not look beyond the express terms of the oral contract, which

support its claim to the returned money.  PWE next argues that even if the Court

finds the terms of the contract to be ambiguous, the extrinsic evidence

demonstrates the contract should be interpreted to support PWE's claim in its

entirety.  The Court addresses each of the arguments in turn.

32

### 1. Express Terms of Contract

PWE argues the express terms of its oral rebate contract with RSI address and resolve this issue.  Under North Dakota law, if the parties' intentions are "ascertainable from those [express] terms", the issue becomes "a question of law for the Court to decide."  Id. at 422.  An express contract: "[M]ust be reasonably definite and certain in its terms so that a court may require it to be performed.  The contract must be definite enough so as to ascertain what is required of the parties as courts will not uphold the agreements which are indefinite and uncertain as to the parties' obligations."  Matter of Estate of Hill, 492 N.W.2d 288, 293 (N.D. 1992) (citing Mag Constr. Co. v. McLean County, 181 N.W.2d 718 (N.D. 1970)).

PWE asserts that the oral agreement meets these standards.  PWE asserts that the oral agreement shows RSI gets a 1% fee and its expenses, as shown in PWE's Exhibit 3, and PWE gets all the rest of the money.  PWE argues RSI already got all it was entitled to, and PWE gets the remaining funds.  Those remaining funds now include the money returned to the RSI bankruptcy estate by the State of North Dakota.

The Court disagrees.  There are no express terms of the contract addressing the unusual issue that has arisen here; money paid in taxes years earlier being unexpectedly returned to the RSI bankruptcy estate well after the parties finished their contractual relationship.  The undisputed, existing terms of the oral contract

33

in no way address this situation.  The Court thus rejects PWE's express contract
argument.  The formula for allocating or dividing the returned money is not in the
oral agreement.  PWE's argument that the formula is in the agreement and should
be applied to address this situation is not plausible.

The simple fact is that this money should be viewed as money returned to
the potential "rebate pool"—which was in fact RSI's takeout.  The language the
parties "agreed" upon to divide available RSI takeout money was based on
assumptions that taxes were a fixed cost of RSI.  The retainage pool available for
negotiation on rebates was limited by that fact.  The Court is unable to find any
intent in the express terms of that agreement that PWE should get all returned tax
money attributable to its bets.

The parties seem to agree on most of the basic terms and functioning of the
oral agreement, but they disagree strongly on the intended meaning of the terms of
the oral agreement.  Under PWE's interpretation, RSI got 1% and the money
needed for fees, taxes, and other expenses.  PWE would get the remaining
money—which would include returned money.  Under Bala's interpretation, PWE
got 11% and RSI got everything else.  RSI would get all remaining money—
including unexpectedly returned money.  These are both theoretically plausible
interpretations of the intentions of the terms they orally agreed on and worked

34

with.  But neither interpretation offered stands firm on the express terms of the oral agreement alone.

This is simply not an agreement wherein the "parties' intentions [are] ascertainable from the terms of the oral contract. . .." <u>Tallackson Potato Co.</u>, 278 N.W.2d at 422.  The oral agreement never specifically addressed in any express terms what they intended to happen if taxes were invalidated and money was returned to RSI.

North Dakota law specifically states: "However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract."  N.D. Cent. Code § 9-07-13.  This statutory language is really just a more specific statement of the most foundational rule of contract interpretation: "A contract is to be interpreted to give effect to the mutual intention of the parties at the time of contracting."  N.D. Cent. Code § 9-07-03.  Here, the Court finds no mutual intention of PWE and RSI to address this situation at the time they entered into the oral agreement.

In cases discussing § 9-07-13 and its rule that the terms of a contract include only things the parties intended to contract about, North Dakota courts have provided additional reasoning that applies here.  One court noted that the foundational requirement of mutual intention (§ 9-07-03) cannot be met and the consent of the partner necessary to contract cannot be shown "unless the parties all

35

agree upon the same thing in the same sense." Thompson v. Thompson, 391

N.W.2d 608, 610 (N.D. 1986) (quoting N.D. Cent. Code § 9-03-16).  The result in

Thompson, like the result here, is that there was "no contract" on the issue before

the Court.  See also Pamida, Inc. v. Meide, 526 N.W.2d 487, 490–91 (N.D. 1995)

(discussing these North Dakota contract guidelines and declining to extend a

contract to something the parties did not spell out or intend to address at the time

of contracting); Meyer v. Hansen, 373 N.W.2d 392, 395–96 (N.D. 1985) (citing

same).

The North Dakota Supreme Court recently decided an analytically

comparable case in a similar fashion.  Burk v. North Dakota, 890 N.W.2d 535

(N.D. 2017).  In Burk, the plaintiff claimed his contract, a settlement with North

Dakota, intended him to get mineral royalty rights he received from the State tax-

free, the same as the State's mineral royalty right are treated.  Id.  The North

Dakota Supreme Court rejected the plaintiff's interpretation of the agreement

finding the agreement nowhere stated the plaintiff was to have tax-free royalty

payments.  Id. at 541–42.  That Court found that if such a unique and valuable right

was intended to be part of the contract, "it defies logic to suggest that taxes would

not have been specifically mentioned."  Id.  The North Dakota Supreme Court

found it significant that the plaintiff all but conceded there was never a mutual

agreement on taxes and declined to give weight to plaintiff's assertions that he had

36

certainly viewed it that way.  Id. at 542.  The Court concluded: "The secret

intention of the parties, if different from the expressed intention, will not prevail,

as the law looks to what the parties said as expressing their real intention."  Id.

(quoting Westhoff v. Klein, 436 N.W.2d 243, 245 (N.D. 1989) (internal citations

omitted)).

    This Court reaches a similar conclusion here.  The oral agreement between

RSI and PWE did not address and never intended to address the situation here—

where a huge sum of money was returned by the State to the RSI's bankruptcy

estate after a finding the State had no authority to receive taxes RSI had paid on the

betting activity of PWE and others more than a decade earlier.  Moreover, Peter

Wagner, owner of PWE, essentially conceded that the agreement did not address

any retroactive change in the amount of tax paid.  The Court thus concludes that

the parties never anticipated this as a possibility and, thus, never intended to

address it.

## 2.  Interpretation Looking to Extrinsic Evidence

    Both parties have attempted to explain through additional testimony and

evidence that the underlying intention of the oral agreement on this question

favored their argument.  PWE argues that at a minimum, the oral agreement is

ambiguous.  In such a situation, the Court looks to extrinsic evidence to determine

whether the oral agreement intended to resolve this issue in favor of either party.

Id.  Stated in another way, with reference to PWE's burden of proof, PWE is attempting to show through the weight of extrinsic evidence that the intention of the parties to the oral agreement was that PWE was to receive any tax money returned in the future.

In spite of this Court's conclusion that the terms of the oral contract show that the parties never contemplated this scenario, the Court notes that it is still possible to view PWE's arguments as raising the issue of "latent ambiguity" in the oral agreement which allows extrinsic evidence to clarify.  "Latent ambiguity" arguments have arisen in cases addressing the rule of interpretation now stated in N.D. Cent. Code § 9-07-13—that is the terms of a contract extend only to things the parties intended to contract about.  "[A] latent ambiguity [is] an ambiguity arising when a writing appears unambiguous on its face, but some collateral matter makes the meaning uncertain." Gawryluk v. Poynter, 654 N.W.2d 400, 464 (N.D. 2002) (citing Harney v. Wirtz, 152 N.W. 803, 807–08 (N.D. 1915)).  See also Goodall v. Monson, 893 N.W.2d 774, 778 (N.D. 2017) (citing same).  Yet, it has long been held that in cases of latent ambiguity, that even extrinsic evidence "can do no more than explain the doubtful expressions of the instrument consistently with the relations of the parties and the other incidents of the contract." Goodall, 893 N.W.2d at 778 (quoting Harney, 152 N.W. at 807–08).  Extrinsic evidence

offered "not to explain an ambiguity, but merely to add something to the contract"
is not allowed.  Harney, 152 N.W. at 808.

As noted in the previous section, the oral agreement contained language
specifically addressing only the allocation of rebate money based on what the
parties knew at the time of their agreement.  PWE, at best, is arguing that the
agreement becomes ambiguous when the money previously assumed to be for
taxes is returned after unanticipated Court rulings holding there was no power to
tax.  PWE's latent ambiguity argument would be that this later event makes its oral
argument with RSI ambiguous about how extra money would be treated.  PWE, in
essence, argues that extrinsic evidence explains the ambiguity, how the structure of
the rebating agreement meant to address this situation, and that as properly viewed
the extrinsic evidence helps show the agreement actually means PWE prevails on
its claim.

The Court has reviewed the extrinsic evidence offered during the three-day
hearing and is not persuaded.  The evidence suggests that if the parties had actually
faced the situation where money otherwise allocated for taxes became available
during the course of the contractual relationship, they would have renegotiated
their deal.  They did not intend to cram new circumstances like this into a formula
designed to deal with very different circumstances.

39

The Court bases this finding on two, undisputed facts in the record.  The first is the fact that the same parties—RSI and PWE—actually faced these "new facts" when they did business together in a different location—described as the Nuevo Laredo location.  When they decided to do business together in Nuevo Laredo, there was no tax like the 3.8% North Dakota tax they had to figure into their North Dakota deal.  The Nuevo Laredo location, where no taxes were in play, triggered extensive new negotiation.  RSI and PWE ultimately split that additional available money, RSI took 1/3 and PWE took 2/3.

Had the North Dakota agreement been as Wagner testified—"She got 1% and I got the rest" and had it meant that any newly available tax money would go to PWE—there would be no reason to make a new deal in Nuevo Laredo.  If the North Dakota deal intended to give all the additional tax money to PWE, it seems very likely Wagner would have demanded that their Nuevo Laredo deal be the same.  The fact that there would be additional money available in Nuevo Laredo would not have triggered a renegotiation and resulted in a compromise deal.

Moreover, if the North Dakota deal had limited RSI to 1% and PWE got the rest, the record suggests that PWE—not RSI—would have gotten an even better deal in Nuevo Laredo.  Wagner testified that he provided much of the operating and investment money to get Bala established in Nuevo Laredo.  In North Dakota, however, Bala had established RSI and had made the investment to set up

40

operations well before Wagner asked if PWE could play there.  Common sense

suggests that RSI would get a better deal in North Dakota, where Bala had more

time and money invested, and a lesser deal in Nuevo Laredo, where Wagner made

a large initial investment and looked to re-coup the start-up money he provided.

The Court thus concludes PWE's insistence, through Wagner's testimony, that the

North Dakota deal was carefully limited to give RSI only 1% and expenses, is not

credible and not supported by other evidence of how the parties did business.

The other evidence influencing the Court's decision is testimony by Susan

Bala stating the parties would have renegotiated if the taxes were ever declared

illegal.  While Bala argued at length that the oral agreement favored her entirely

and required that all the money would go to RSI—she admitted that had the tax

been abolished during the PWE–RSI agreement, the parties would have

renegotiated to provide PWE with a larger rebate.  She also admitted this would

have happened with Mr. Carlson—who asserts a similar claim here.

PWE argues that the extrinsic evidence from Wagner's testimony shows that

he intended the agreement to deal with taxes and every other possibility—and

PWE should get everything after a 1% fee and RSI's expenses.  The Court finds

that argument does not carry much weight.  At best, that testimony is evidence of

Wagner's "secret intention" when contracting and does not alter the Court's

conclusion.  Burk, 890 N.W.2d at 542.  The Court finds Wagner's testimony to be

41

little more than an attempt "to add something to the contract"—which is entirely ineffective extrinsic evidence. <u>Harney</u>, 152 N.W.2d at 808.

The Court's conclusions also rest on a finding that the testimony of Wagner is mostly not credible. Wagner did not explain how the terms of the oral agreement were reached, why PWE and RSI structured it the way they did, or why they did not address this specific issue with clarity. He simply repeatedly stated that: "She got 1% and we got the rest." His testimony did nothing to help the Court understand why the existing agreement should apply in dramatically different circumstances like this where millions of dollars suddenly became available. His testimony seemed to be self-serving and little more. His demeanor, in addition to his actual testimony, further contributed to this finding.

Even if the Court found that neither Wagner's nor Bala's version was credible, this would not help PWE. The fact remains that PWE has the burden of proof. The Court, however, does not find the credibility of Wagner and Bala to be equal. The Court finds Wagner's testimony to be considerably less credible than that offered by Bala. She provided a full explanation of why things were done as they were, and how they ultimately arrived at their deal. Unlike Wagner, Bala also ultimately conceded what this Court concludes to be the reality of the situation, that the parties most likely would have renegotiated and come to a new deal had they faced this specific issue during the course of their contractual relationship.

Bala's testimony that the agreement was clear on its face and that RSI should get the money is equally self-serving and lacks some credibility. Her other testimony, however, was more credible. Her concession that a new agreement would probably have resulted had the tax been repealed or overturned during their contractual relationship is credible. Overall, Bala provided more support for her testimony and had a more truthful demeanor than did Wagner.

To the extent the Court looks to latent ambiguity arguments, and looks to extrinsic evidence, it does not change the Court's conclusion that nothing in the oral agreement between the parties intended to address or actually did address the merits of PWE's claim. PWE has thus failed its burden of proof on its contract-based theories.

### C. Implied Contract, Quasi Contract, and Unjust Enrichment

PWE has argued that even if the Court did not find that the contract gave PWE the rights it asserts to the returned money, that theories of implied contract, quasi contract, or unjust enrichment support that right. "The law recognizes two classes of implied contracts: contracts implied in fact and contracts implied in law, more commonly referred to as quasi or constructive contracts." Jerry Harmon Motors, Inc. v. Heth, 316 N.W.2d 324, 327 (N.D. 1982). The Court deals first with the question of contracts implied in fact.

43

### 1.  Implied in Fact Contract

"An implied in fact contract is one the existence and terms of which are manifested by conduct." Lord & Stevens, Inc., v. 3D Printing, Inc., 756 N.W.2d 789, 793 (N.D. 2008) (internal quotation omitted).  "When dealing with contracts implied in fact the court is required to determine from the surrounding circumstances what the parties actually intended." Id. (quoting Jerry Harmon Motors, 316 N.W.2d at 327).

The Court concluded that PWE had no right to the returned money under the oral rebate agreement and that the only discernable intent of the parties related to this issue was that they would have negotiated further in the event taxes were removed in the future.  To have an implied in fact contract, the intent of the parties must be clear from their conduct.  PWE asks this Court to find that it and RSI had an implied in fact contract stating that PWE was to receive any returned tax money attributable to its bets.  The parties' conduct, however, shows the exact opposite of this.  When faced with a very similar contractual scenario but without the state level taxes in the Nuevo Laredo deal, they renegotiated.  The Court, therefore, declines to find a contract implied in fact.

### 2.  Contract Implied in Law and Unjust Enrichment

"A contract implied at law permits the Court to apply an equitable remedy while recognizing it is an obligation imposed by law to do justice even though it is

clear that no promise was ever made." Matter of Estate of Hill, 492 N.W.2d 288,

295 (N.D. 1992) (citing Gate City S. & L. Ass'n v. Int'l Bus. Mach. Corp., 213

N.W.2d 888 (N.D. 1973). "Contracts implied in law are fictions of the law,

actually not contracts, created on principles of unjust enrichment and presumption

of performance of duty, without regard to the assent of the parties." Estate of Hill,

492 N.W.2d at 295. In Estate of Hill, the court stated:

> The essence of an implied-at-law contract is the receipt of
> a benefit by a decedent during his life which it would be
> inequitable for the decedent to have retained without
> payment. If it would be inequitable for the decedent to
> retain the benefit, the estate is said to be unjustly enriched.

Id. (cited source omitted).

"Unjust enrichment is a broad, equitable doctrine which rests upon quasi or

constrictive contracts implied by law to prevent a person from unjustly enriching

themselves at the expense of another." Id. (cited source omitted). "The doctrine

serves as a basis for requiring restitution of benefits conferred in the absence of an

express contract." Id. (cited source omitted). Stated another way:

> A quasi contract arises where a transaction between parties
> gives them mutual rights or obligations, but does not
> involve a specific agreement between them. Such
> contracts are obligations created by law for reasons of
> justice. Receipt of benefits, which it would be inequitable
> to retain without paying therefor, constitutes the essence
> of quasi-contractual obligations.
> . . .
> Quasi contracts impose an obligation for reasons of justice
> and are founded upon principles of unjust enrichment.

45

<u>Jerry Harmon Motor, Inc.</u>, 316 N.W.2d at 328 (cited and quoted sources omitted).

PWE argues that, at a minimum, the principles of implied or quasi contract entitle it to the majority of the money returned to the estate. PWE essentially claims it would be inequitable for RSI to retain the money when PWE actually provided the money for the "tax" to begin with. PWE claims that because it paid the money for tax to RSI, and RSI simply passed it to the State, PWE should get the money back now that it has been returned. Stated another way, PWE seems to assert that RSI took money from the deal with PWE as an expense, but that expense was later refunded to RSI and, as a matter of justice, should go back to PWE as the party that actually paid the expense.

The Court will also address another possibility for applying implied or quasi contract here based on its previous conclusion. The Court concluded that there was no contract term that addressed the possibility of returned tax money and the parties intended—at most—to renegotiate their agreement in the event that taxes were eliminated in the future  The Court will address whether that intention to renegotiate and share the money necessitates some equitable adjustment that recognizes each party likely would have gotten some of the benefit of the returned tax money.

While the principles governing this equitable issue are very broad and leaves the Court much discretion, the North Dakota Supreme Court has provided some

46

pretty detailed standards that govern this inquiry.  In <u>Estate of Hill</u>, the North

Dakota Supreme Court specifically stated:

> To recover under a theory of unjust enrichment, one must
> provide five elements: (1) an enrichment; (2) an
> impoverishment; (3) a connection between the enrichment
> and the impoverishment; (4) absence of a justification for
> the enrichment and impoverishment; and (5) absence of a
> remedy provided by law.

492 N.W.2d at 295 (cited source omitted).  Other North Dakota cases have relied

on the following, slightly different, statement summarizing the law:

> The essential elements of quasi contract are a benefit
> conferred on the defendant by the plaintiff, appreciation
> by the defendant of such benefit, and acceptance and
> retention by the defendant of such benefit under
> circumstances such that it would be inequitable for him to
> retain the benefit without payment of the value thereof. In
> other words, the receipt of a benefit, inequitable to retain,
> is the essence of quasi-contractual obligation, no cause of
> action can lie in quasi contract against one not shown to
> have been enriched **wrongfully** at plaintiff's expense, and
> the mere fact that a person benefits another is not of itself
> sufficient to require the other to make restitution therefor.
> The person receiving the benefit is liable to pay therefor
> only if the circumstances of its receipt or retention are such
> that, as between the two persons, it is unjust for him to
> retain it.

<u>Gate City</u>, 213 N.W.2d at 893-94 (citing CJS Contracts) (emphasis added).  <u>See</u>

<u>also</u> <u>Jerry Harmon Motors</u>, 316 N.W.2d at 328 (citing majority of source).  In <u>Jerry</u>

<u>Harmon Motors</u>, the North Dakota Supreme Court continued:

> A valid claim for unjust enrichment can be **based only on
> an element of misconduct** or **fault** or **undue advantage**

> taken by one party of another, and, in the absence of fraud
> or bad faith, a person is not entitled to compensation on
> the ground of unjust enrichment if he received from the
> other that which it was agreed between them that the other
> should give in return. Also, a person is **not unjustly
> enriched by retaining benefits involuntarily acquired
> which** law and equity give him absolutely without any
> obligation on his part to make restitution.

316 N.W.2d at 328 (quoting CJS Contracts) (emphasis added).

PWE's quasi contract claim is that it actually provided the money that RSI

sent to the State as tax payment—and when that money was returned to RSI by the

State, RSI had the equitable duty to return it to PWE.  In essence, PWE argues that

it was the taxpayer and that RSI simply collected and remitted the taxes to the State

on its behalf.  As such, PWE should receive the returned tax money since it was

determined to have been unlawfully collected.  While this argument is also

addressed in discussions of Carlson's claim, for now, it suffices to say that the

Court rejects PWE's claim that it was the taxpayer.  See Lakhani v. C.I.R., 142

T.C. 151, 160 (2014) ("[T]he taxes, license fees, and other expenses discharged

from the takeout are expenses imposed upon the track, not the bettors.").

PWE also seems to argue that even if it was not technically the taxpayer, it

essentially supplied the funds to RSI to pay the tax by allowing RSI to claim the

tax as an expense in their negotiated agreement.  PWE seems to be arguing that it

took less in the deal with RSI because they all believed RSI had tax as a legitimate

expense.  Now that it turns out that the tax was not a legitimate expense, PWE argues it would have gotten extra money as part of the deal.

The Court rejects PWE's argument for several reasons.  PWE's argument is not supported by the record.  The Court has already found that the parties did not intend that PWE should receive this money in the event it was returned.  The parties did not express their intent for this to happen in the contract or through extrinsic evidence.  There is nothing else PWE has pointed to showing that PWE was treated unfairly.

PWE has also not shown that it was aggrieved in a way that equity can address.  PWE cannot show this tax money was a "benefit conferred on [RSI] by [PWE]."  Jerry Harmon Motors, 316 N.W.2d at 328; Gate City, 213 N.W.2d at 893.  To the extent there was a benefit conferred upon RSI—or RSI was "enriched"— at all, the benefit came from an unexpected court decision returning the money to RSI.  It did not come from PWE.

PWE also cannot show it was "impoverished" in any way.  Jerry Harmon Motors, 316 N.W.2d at 328; Gate City, 213 N.W.2d at 893.  It got all it bargained for it, which was a much better deal than most bettors who got no rebate at all.  RSI is not using a legal technicality to hold on to something that really belongs to PWE.  PWE, at most, can show that it would have pressed to negotiate for more money had the tax been eliminated during the course of their contractual

49

relationship.  Missing out on a theoretically better deal in the past by the
occurrence of unforeseen events in the future does not qualify as an
impoverishment under these equity principles.

PWE also cannot show that this all occurred "under circumstances such that
it would be inequitable for [RSI] to retain the benefit without payment" to PWE.
Jerry Harmon Motors, 316 N.W.2d at 328 (internal quotations omitted).  "The
person receiving the benefit is liable to pay therefor **only if** the circumstances of its
receipt or retention are such that, as between the two persons, it is unjust for him to
retain it."  Jerry Harmon Motors, 316 N.W.2d at 329 (emphasis added).  PWE did
not make any showing that "as between" RSI and PWE, "it is unjust for [RSI] to
retain" the money instead of PWE.

PWE has not sustained its burden of showing a greater entitlement to the
money.  In fact, the circumstances here show the RSI has a more equitable claim to
the money.  PWE tries to limit the circumstances to be considered to only those
supporting PWE's version of the oral contract (which the Court already has found
lacking).  The Court finds the full circumstances are relevant and show equity from
RSI.  RSI was entitled under the law to its takeout, the only compensation RSI
received as the service provider.  RSI got only that money and had to pay all of its
expenses, including any tax expense, from it.  RSI operated for years before doing
business deals with PWE or any professional gamblers.  RSI got its takeout and

had to pay its expenses, which at the time included a 3.8% tax to the State of North

Dakota.  Any amount remaining in the takeout after these expenses was kept by

RSI as profit.

When professional bettors, and PWE in particular, came to do business with

RSI, they used their market position to demand part of RSI's takeout.  At the time

RSI negotiated deals with these professional gamblers, the only money RSI could

use was the amount of the takeout minus expenses which appeared to everyone

involved to include taxes.  RSI negotiated with only its money from the takeout—

and PWE did as well.  PWE never claimed during the life of their relationship that

it should get the tax money, that PWE believed taxes were an improper RSI

expense, or that PWE offered to become the taxpayer as part of the deal.  Even if

PWE was, in its mind, trying to get everything beyond the 1% RSI management

fee, it still admits it was giving RSI 1% plus its expenses (which all parties

believed included taxes at that time).

The circumstances here thus show the professional gamblers, including

PWE, pressed RSI for as big a percentage of RSI's money as they could get.  RSI

was left to pay all obligations—including taxes—with less money.  RSI's

obligation on its side of the ledger with PWE and all professional gamblers,

included paying taxes during the entire time of the contractual relationships.  RSI

thus continued what appeared to everyone to be RSI's legal obligation to pay the

taxes.  In these circumstances, it is not at all apparent that when taxes were

declared by a court many years later to be invalid—and significant money flowed

back to the estate—that PWE had any equitable claim to that money.  The evidence

certainly does not show an entitlement in equity for PWE greater than RSI.  It was

RSI's money to begin with—until professional gamblers started to demand more of

it.  It is thus RSI's money when it was returned to the bankruptcy estate years later.

  PWE appears to suggest that, had the taxes been declared illegal during the

course of the contractual relationship, it would have negotiated for a deal under

which it got the full benefit both retroactively and prospectively.  Even if this were

true, it is not the type of "impoverishment" that equity means to address.  There

was no loss to PWE, just potentially less gain than it otherwise would have

bargained for.  Moreover, the record does not support Wagner's contention that he

would have gotten PWE the full amount of the revoked tax as a rebate.  PWE has

put forward no evidence that, had the taxes been returned during the course of

PWE and RSI's contractual relationship, Wagner would have negotiated with RSI

for the retroactive return of tax dollars.  In fact, Wagner admitted on cross-

examination that he never even thought about the possibility of going after taxes

retroactively paid.  The only evidence that Wagner would have successfully

negotiated with RSI to get PWE at least some of the benefit of the eliminated taxes

going forward is from the Nuevo Laredo deal which shows PWE would not have gotten the full amount of these taxes.

Based on the outcome of the Nuevo Laredo deal, the Court can say any renegotiated rebate agreement in North Dakota would likely have resulted in PWE and RSI splitting the benefit of the reduced taxes in some way. The problem is, that there is absolutely no evidence to suggest how that split would be made. Even if the Court chose to rely on equitable principles and divide the money based on some theoretical renegotiated deal, which it does not, there is no evidentiary basis to inform where it should draw this line. The Court would be forced to guess or speculate on the proper division of the funds.

The only relevant example the Court would have to consider in making this theoretical division is the agreement the parties reached in the Nuevo Laredo deal, 2/3 for PWE and 1/3 for RSI. The Nuevo Laredo deal, however, appears to have additional, very different, elements to consider than the elements at play in the North Dakota. For instance, Wagner testified he supplied virtually all of the operating capital for the Nuevo Laredo location. This appears to mean Wagner was paying expenses in Nuevo Laredo that Bala, through RSI, paid in the North Dakota operation. Bala built RSI and funded its physical space, equipment, licensing, and other expenses in North Dakota. Wagner appeared to testify that he paid those expenses in Nuevo Laredo. Thus, a deal providing him 2/3 of the

53

additional money in Nuevo Laredo would appear to make sense there. It would not, however, make sense for or be readily applicable to North Dakota. The circumstances were very different in North Dakota and would likely have called for a very different deal, one more favorable to RSI. In the end, there is no readily usable formula the Court could use to account equitably for the competing interests of PWE and RSI and fairly allocate the funds.

The Court also notes that PWE never claimed entitlement to any retroactively returned funds–originally paid as taxes–in its original claim. This is a factor to consider here because PWE filed its original claim while it was actively arguing the taxes were invalid. It was only many years later, after PWE prevailed on the claim for the bankruptcy estate, that it began to argue that this was in fact not the bankruptcy estate's money. While PWE did not waive its claim to the returned money, the Court finds that its failure to raise its entitlement earlier–when it was making the claim for the estate–goes to the credibility of PWE's belated assertion that this was its money. At a minimum, it shows that PWE's arguments about unjust enrichment are lacking for an addition reason.

Even if the Court was going to ignore all the rationale in the paragraphs above, which it is not, the law of unjust enrichment in North Dakota requires one additional requirement to apply, which PWE cannot meet. The North Dakota Supreme Court has stated: "A valid claim for unjust enrichment can be based **only**

on an element of misconduct or fault or undue advantage taken by one party

or another. . . ." <u>Jerry Harmon Motors</u>, 316 N.W.2d at 328 (emphasis added).

There is no suggestion at all, by PWE or any party, that RSI engaged in

misconduct or fault, or took undue advantage of PWE in regard to their rebate

agreement.  PWE's entire claim for implied as quasi contract relief must thus fail

for this additional and separate reason.

## II.    Carlson's Claim

Carlson filed his claim for $380,848.44 on June 7, 2016.  In his brief,

Carlson claims $359,904.42 to $389,851.24, plus interest.  The range on his claim,

he states, depends on the Court's determination of the appropriate tax rate—3.7%

or 3.8%.  Carlson, like PWE, asserts that this is the amount of improperly collected

taxes attributable to his bets.  He seeks those amounts as his claim here.

Carlson also bases his claim on theories of breach of contract and unjust

enrichment.  In this respect, Carlson makes a contract claim like PWE, but on a

different factual basis than PWE.  Carlson argues that his agreement with RSI was

that he would receive any benefit if there were ever a change in the tax on his

wagering.  Carlson argues that his oral agreement with RSI thus would have been

more beneficial to him—if the tax were different.  Carlson concludes that based on

his agreement with RSI, he should now receive all the unauthorized tax money

attributable to his betting that has been returned to the estate.

Carlson also argues—like PWE—that he was the taxpayer. Carlson argues that the taxation of his account wagering was similar to a sales tax, which the purchaser pays to the vendor, who in turn collects and remits the tax to the state. Carlson concludes that as the taxpayer he should receive the returned taxes. Carlson notes that throughout the trial on these matters the evidence was clear and undisputed that RSI never marked up taxes and that doing so would have been out of line with industry standards. Carlson concludes that he is entitled to the illegal taxes assessed on his wagering activity with RSI under the doctrine of unjust enrichment.

Bala objects to Carlson's claim. Bala argues that her agreement with Carlson did not contemplate that Carlson would receive tax money retroactively. Bala argues that her discussions with Carlson related to possible changes in North Dakota taxes prospectively—i.e., going forward. Bala testified that she was assuaging Carlson's desire for a greater rebate by letting him know that if the tax structure changed in the future, then she would be able to negotiate a greater rebate with him on his future wagering. Bala concludes that her agreement with Carlson did not contemplate retroactive payments of all returned tax money. Instead, she simply committed to renegotiate and give Carlson a better deal if taxes changed going forward.

## A.  Burden of Proof

When a creditor files a proof of claim, the claim is deemed allowed and the proof of claim is prima facie evidence of the claim's validity and amount.  In re Tanner, Bankr. No. 12-01429, 2013 WL 2318848, at *4 (Bankr. N.D. Iowa, May 28, 2013) (citing In re Be–Mac Transp. Co., 83 F.3d 1020, 1025 (8th Cir. 1996)). "If an objection to the claim is made, the court, after notice and a hearing, must determine the amount of the claim fixed as of the date of the petition."  Id. "Bankruptcy Rule 3001(f) places the burden of producing some evidence to rebut the presumption of validity on the objecting party."  Id. (citing In re Dove–Nation, 318 B.R. 147, 152 (B.A.P. 8th Cir. 2004)). "If this burden of production is met, the ultimate burden of persuasion as to the allowability of the claim resides with the creditor."  Id. (citing Dove–Nation, 318 B.R. at 152; Be–Mac Transp., 83 F.3d at 1025 n. 3.).

Here, Bala has rebutted the presumption of validity of Carlson's claim.  Bala testified that Carlson misunderstood her comments about what would happen if North Dakota taxes changed.  She stated that her agreement with Carlson did not contemplated retroactive payments like those that Carlson seeks here.  This evidence rebuts the presumption of validity of Carlson's claim, so the burden is on Carlson to prove that the Court should allow his claim.

Carlson presents two main arguments in support of his claim. First, he brings a contract claim arguing that his deal with RSI was that any change in North Dakota taxes would inure to his benefit. Second, he argues that the Court should award him the returned tax payments under the doctrine of unjust enrichment. He argues that he was the taxpayer and analogizes the taxes in issue here to sales tax in another case. Carlson concludes that if RSI were allowed to retain the tax money, RSI would improperly profit from the taxes he paid and would be unjustly enriched at his expense. For the reasons that follow, the Court rejects both these arguments, finding the evidence does not support them.

### B. Carlson's Contract Claim

The same standards apply to Carlson's contract claim as those the Court applied to PWE's contract claim. Carlson had an oral rebating agreement with RSI. Under this agreement, RSI issued a rebate to Carlson out of RSI's takeout based on the size and type of Carlson's bets. Carlson does not dispute that RSI was responsible for paying fees and remitting taxes to the State of North Dakota at that time. Carlson argues that RSI paid the fees and taxes, kept a set percentage for itself, and returned the rest of the takeout to him under their oral refund agreement. Bala, who entered into the agreement on behalf of RSI, testified that she agreed to rebate approximately 9–11% of Carlson's bet total depending on the bet pools he played, and that Carlson was happy with that amount. He let her decide how she

58

reached the exact amount of the refund.  She testified that, if Carlson felt that RSI
was giving him an inadequate rebate—or for any other reason—he could stop
placing bets with RSI.  Carlson, on the other hand, testified that his refund varied
between 9% and 14% of his total bets and that he believed that RSI was taking a
fee of approximately 3.5%.  To the extent that Carlson argues that RSI was limited
to this fee, the Court disagrees.  There is even less evidence to support Carlson's
argument than there was to support PWE's similar claim.  RSI and Carlson based
their rebating agreement around the rebate percentage he would receive, not the
percentage that would go to RSI.  None of those terms, however, addressed the
specific issue involved here.  Thus, the Court concludes that Carlson, like PWE,
has no claim for breach of an express contract provision.

Carlson's main argument, however, is that he had an amended oral
agreement because he and RSI had expressly discussed and agreed to what would
happen if the North Dakota tax situation changed.  The Court again reiterates the
legal standards it laid out in reference to PWE's claims to address the extrinsic
evidence here.

Carlson testified that Bala, on behalf of RSI, promised that he would receive
the benefit of any future tax decreases.  Carlson states that he and Bala specifically
discussed her lobbying efforts to reduce the taxes on horse racing in North Dakota
and that Bala promised that Carlson would receive any benefit if her efforts were

successful.  Carlson testified specifically that Bala said, "[I]f something changes in the future we can look at it."

The Court finds that Bala and Carlson did discuss the possibility that North Dakota would reduce its taxes in the future.  The Court further finds that these discussions were always statements of intention to renegotiate the oral agreement in the future.  The parties did not make a binding future modification of the original oral agreement.  As noted in the discussion of PWE's claim—where there is no mutual intention to contract on a particular issue, there is no enforceable agreement.  An agreement to take the issue up in further negotiation is not a demonstration of what the later negotiation would have produced on the issue.  Carlson's testimony that these discussions contemplated retroactive payment of returned tax money, is supported by nothing else in the record.  The Court finds Bala's testimony on this issue to be more credible.  In fact, her testimony is supported by the fact Carlson himself testified that she stated: "If something changes in the future, **we can look at it**."  The parties simply agreed to negotiate in the future if the situation changed.  Accordingly, the Court finds that Carlson has not met his burden to show that RSI promised the funds to him under the terms of his oral rebate agreement.

### C. Unjust Enrichment Claim

The same standards the Court applied to the claim of PWE on theories of quasi or implied contract and unjust enrichment apply here as well.  In summary, a party may invoke the doctrine of unjust enrichment when another "'person has and retains money or benefits which in justice and equity belong to another.'"  Ritter, Laber and Assocs., Inc. v. Koch Oil, Inc., 680 N.W.2d 634, 642 (quoting Midland Diesel Serv. and Engine Co. v. Sivertson, 307 N.W.2d 555, 557 (N.D. 1981)).  "For a complainant to recover, it is sufficient if another 'has, without justification, obtained a benefit at the direct expense of the complainant, who then has no legal means of retrieving it.'"  Apache Corp. v. MDU Res. Grp., Inc., 603 N.W.2d 891 (quoting Midland Diesel, 307 N.W.2d at 557).  "The essential element in recovering under the theory is the receipt of a benefit by the defendant from the plaintiff which would be inequitable to retain without paying for its value."  Hayden v. Medcenter One, Inc., 828 N.W.2d 775, 781 (N.D. 2013).

Carlson makes several arguments about why it would be inequitable for RSI to retain the money.  He argues he was the taxpayer, Bala and RSI were subject to criminal proceedings, RSI has done nothing to justify the additional compensation, and RSI agreed to never profit from or "mark up," the tax.  The Court finds none of these arguments persuasive under the standards set out in North Dakota law on unjust enrichment.

61

Carlson's main argument is that the tax here was like a sales tax.  He relies

on Mann v. North Dakota Tax Comm'r., 692 N.W.2d 490 (N.D. 2005).  In that

case, the North Dakota Supreme Court held that a motor vehicle fuels tax was not

applicable to Native Americans buying gas on Indian reservations.  Id.  The North

Dakota legislature had established a statutory scheme under which Native

Americans who purchased gas on Indian reservations while this tax was in effect

could apply to the state for a refund.  N.D.C.C. § 57-43.1-03.2.  Carlson cites

Mann in support of his argument that a customer who buys a product and pays

sales tax is the taxpayer, and therefore entitled to any rebate if those taxes are

invalidated, not the retailer who collects them.  Carlson concludes that RSI would

be unjustly enriched at his expense if the Court denies his claim.

Carlson argues that this money started with him, that he was the taxpayer,

and that RSI will improperly profit at his expense if it retains this money.  The

Court rejected these same arguments when it addressed PWE's argument that

equity required upholding its claim.  For the same reasons the Court rejected

PWE's arguments on this issue, the Court also rejects Carlson's unjust enrichment

claim.

Again, RSI, not Carlson was the taxpayer.  See Lakhani, 142 T.C. at 160

("[T]he taxes, license fees, and other expenses discharged from the takeout are

expenses imposed upon the track, not the bettors.").  The Court finds that the

Lakhani case is more like the taxes in this case (taxes on horse race wagering), than the taxes in Mann, which was indisputably a sales tax.

Carlson got what he bargained for with RSI, and like PWE was not unfairly deprived of something that was his. Carlson has not shown that RSI's and Bala's overturned criminal convictions have anything to do with this particular analysis of unjust enrichment. The record further fails to support a finding that RSI or Bala had unclean hands or that RSI secretly knew the tax was unauthorized but continued to collect it. All of the additional reasoning the Court set forth in discussing PWE's equitable claim also applies with full force here. All that reasoning, and the reasoning set forth here, demonstrates that Carlson's unjust enrichment claims are without merit. Thus, the Court finds that Carlson has not met his burden to show that the money collected from RSI as a tax and returned to the bankruptcy estate "in justice and equity belong" to Carlson. The Court denies Carlson's claim.

### III.   Bala's Claims

Bala originally filed a claim in this bankruptcy in 2004 for $407,000. Then, on March 31, 2016 and again on July 14, 2016, Bala substantially amended her proof of claim to add and expand the claims. PWE and Trustee dispute three parts of Bala's amended claim: (1) indemnification for legal fees in the amount of $167,437.71 Bala accrued in defending against criminal charges; (2) legal fees in

the amount of $136,156.47 she accrued pursuing a breach of lease action against RSI; and (3) a $1 million claim for damages based on RSI's failure to maintain a life insurance policy.  The parties agree that Bala has the burden to support these claims.  The Court will address each of these claims in turn.

### A. Bala's Indemnification Fee Claim.

Bala was convicted of criminal charges in connection with her position with RSI.  The Eighth Circuit Court of Appeals overturned her conviction in 2007. United States v. Bala, 489 F.3d 334 (8th Cir. 2007).  Bala now asserts a claim against RSI seeking indemnification for the legal expenses she incurred in connection with her defense.

The Debtor is a Delaware corporation whose bylaws include the following indemnification provision:

> Section 8.01. – Indemnification. The corporation shall indemnify such persons for such liabilities in such a manner under such circumstances and to such extent as permitted by Section 145 of the Delaware General Corporation Law, as now enacted or hereafter amended. The Board of Directors may authorize the purchase and maintenance of insurance and/or the execution of individual agreements for the purpose of such indemnification, and the Corporation shall advance all reasonable costs and expenses (including attorneys' fees) incurred in defending any action, suit or proceeding to all persons entitled to indemnification under this Section 8.01, all in the manner, under the circumstances and to the extent permitted by Section 145 of the Delaware General Corporation Law, as now enacted or hereafter amended.

Delaware law provides:

> **To the extent that a present or former director or officer of a corporation has been successful** on the merits or otherwise in defense of any action, suit or proceeding referred to in subsections (a) and (b) of this section, or in defense of any claim, issue or matter therein, **such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith.**

Del. Code. Title 8, § 145(c) (emphasis added); see also Marino v. Patriot Rail Co., 131 A.3d 325, 337–338 (Del. Ch. 2016) (recognizing that Delaware's indemnification law continues to apply even after the person entitled to indemnification ceases to be an officer, director, employee, or agent as long as the decisions or actions that implicate indemnification occurred while the person served in a covered capacity).

The parties do not dispute that Bala was entitled to indemnification under RSI's bylaws and Delaware law. The parties have also stipulated to the amount of fees that Bala incurred in connection with her legal defense. Trustee and PWE argue, however, that her otherwise valid indemnification claim should be denied because she unreasonably delayed in filing it.

Bala filed her amended proof of claim in 2016, twelve years after the filing of Debtor's bankruptcy petition and nine years after her conviction was overturned. Trustee argues that Bala's indemnification claim should be barred or, in the alternative, have a lower priority to payment, because it was filed after the filing deadline proscribed by Bankruptcy Rule 3002. PWE argues that Bala's

indemnification claim should be barred entirely under the doctrine of latches.  The Court will address each of these arguments.

### 1. Timeliness Under Rule 3002

Bankruptcy Rule 3002(c) sets the time by which creditors must file claims. The Court generally strictly construes Rule 3002(c) as a statute of limitations since the purpose of such a claims bar date is to provide the debtor and its creditors with finality and to ensure the swift distribution of the bankruptcy estate.  In re Robert Stone Cut Off Equip. Inc. and Bently Weldery & Mach. Co., 98 B.R. 158, 160 (Bankr. N.D.N.Y. 1989).

A creditor's failure to file a proof of claim in the time prescribed by Rule 3002 does not bar recovery.  In re McLaughlin, 157 B.R. 873, 876 (Bankr. N.D. Iowa 1993) ("Tardiness is not a ground for disallowance despite the implication of Rule 3002(a) that the claim must be filed in accordance with the Rule to be allowed").  The timeliness of the creditor's proof of claim does, however, affect the priority of its claim.  Id.  The Bankruptcy Code provides:

> (a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects.
>
> (b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, **if such objection to a claim is made**, **the court**, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and **shall allow such claim in such amount, except to the extent that—**

(9) **proof of such claim is not timely filed, except to the extent tardily filed as permitted under paragraph (1), (2), or (3) of section 726(a)** of this title or under the Federal Rules of Bankruptcy Procedure. . ..

11 U.S.C. § 502.  The Code is clear that, among unsecured claims, timely filed claims are paid first, then tardily filed claims where the creditor "did not have notice or actual knowledge of the case in time for timely filing," then other tardily filed claims.  11 U.S.C. § 726(a).

In this case, the claim deadline date was September 21, 2004.  Bala timely filed her original proof of claim on September 21, 2004.  Bala substantially amended her proof of claim more than 11 years later—on March 31, 2016 and again on July 14, 2016.  Although captioned as amendments, Bala's 2016 fillings added substantially different claims from her 2004 proof of claim.  Bala's 2016 "amended" claims are, in reality, new claims and the Court will treat them as such.

Bala argues that it was impossible for her to file her indemnification claim by the September 2004 deadline because she had not yet incurred the legal fees. She states that her claim was not ripe until her criminal conviction was overturned by the Eighth Circuit in 2007.  Trustee agrees that Bala's indemnification claim ripened in 2007 but argues that Bala was nevertheless dilatory in waiting until 2016—about 9 years—to amend her proof of claim to add the indemnification claim.

The Court would normally have no trouble agreeing with Trustee.  Bala's nine-year delay in filing after her claim ripened would, in most normal case settings, be unreasonable.  This case setting, however, is different for so many reasons.  The most important of these many reasons is that, from early on, no one expected much distribution at all in this case.  The estate appeared to have little or nothing to pay even the highest priority claims.  However, as noted many times herein, that all changed when the District Court and Eighth Circuit found the taxes paid were invalid—and ordered a return of this large sum of money to the RSI estate.  This caused Bala, as well as PWE and Carlson, to file new or amended claims making substantially greater claims then before.  The Court has allowed the other new claims by PWE and Carlson to proceed on their merits without regard to normal rules on timeliness.  The Court also has gone to great lengths to allow amendment of pleadings over other parties' objections and allowed parties to assert new theories of recovery more than a decade into the case.  The Court found, in allowing those amendments, that the case changed its complexion entirely and the parties were warranted in adjusting their positions accordingly.  The same goes for Bala's claim here for fees.  It would normally be considered unreasonably late, but it is viewed as timely enough here.  Trustee's objection is thus overruled.

## 2.  The Doctrine of Laches

PWE also argues that Bala's claim should be denied as untimely, but bases

its argument on the doctrine of laches.  "Laches is an equitable doctrine [that]

prevents a court from granting relief to a claimant who has unreasonably delayed

or been negligent in asserting a claim so that the opposing party has been

prejudiced."  In re Timmerman, 379 B.R. 838, 847 (Bankr. N.D. Iowa 2007)

(quoting Strawn v. Missouri State Bd. of Educ., 210 F.3d 954, 956–57 n. 3 (8th

Cir. 2000)).  In order to successfully assert the doctrine of laches, the party

asserting it must show: (1) a delay in asserting a right or a claim; (2) that the delay

was not excusable; and (3) that there was undue prejudice to the party against

whom the claim is asserted.  Roederer v. J. Garcia Carrion, S.A., 569 F.3d 855,

859 (8th Cir. 2009).  The Bankruptcy Court for the District of South Dakota has

said:

> The doctrine of laches applies when a party, notwithstanding the party's
> full knowledge of the facts, unreasonably delays asserting an interest,
> and allowing the party to assert that interest now would prejudice
> others.  **There must be more than just the mere passage of time for**
> **prejudice to be found.**  The facts presented must show the party acted,
> declared, or made a statement that in some manner has misled another
> party to his prejudice.

In re Huffman, Bankr. No. 06-50096, 2007 WL 4212292, at *3 (Bankr. D.S.D.

Nov. 27, 2007) (citations omitted) (emphasis added).

PWE argues that Bala's indemnification claim should be denied because Bala failed to explain why she delayed in amending her proof of claim. Again, the Court would normally agree with PWE that Bala delayed in filing her claim and that she provided no excuse for this delay. But here, the Court cannot agree with PWE, a party that has been allowed to amend legal theories and its own proof of claim—based entirely on the changed circumstances. The Court finds it a bit much for PWE to stand on a doctrine that required it to assert there was "no excuse" for the delay and that there is prejudice to PWE in allowing the claim. The Court gave PWE—and other parties—the same "excuse" for late amendments that it gives to Bala here. PWE similarly has substantially benefited from the Court rejecting prejudice arguments made in resistance to late amendments.

The Court need not critique PWE's approach further—other than to note that PWE's laches arguments would fail on the merits as well. PWE has not satisfied the third element, undue prejudice. PWE points to nothing in the record to show that Bala's delay in amending her claim to add the indemnification fee claim prejudiced PWE or any other party. Bala did not mislead another party through her delay. Bala did not act in such a way that her failure to assert her rights misled another party. PWE's argument that laches should apply and bar Bala's claim rests on nothing more than "the mere passage of time." The doctrine of laches, therefore, does not apply.

70

Thus, the Court finds that Bala's indemnification claim against RSI for the cost of her legal fees defending herself during the criminal proceedings is allowed in its entirety.

## B. Bala's Claim for Fees Related to Lease Breach

Bala also claims $136,156.47 for the legal fees she incurred pursuing a breach of the lease agreement between herself and RSI.  Bala owned the property where RSI had its offices.  RSI and Bala had a lease for that property.

Section 9.1(d) of the lease provides:

> In the event suit shall be brought. . . for recovery of rent or any other amount due under the provision of this Lease, or because of the breach of any other covenant herein contained on the part of Lessee to be kept and a breach shall be established, Lessee shall pay to Lessor all expenses incurred therefor, including reasonable attorney's fees, together with interest and all such expenses at the rate of 12 percent per annum from the date of such breach of the covenants of this lease.

Bala argues that this section of the lease entitles her to the legal fees and interest she incurred when pursuing the back rent from RSI.  Bala claims legal fees from two different law firms in relation to the lease litigation.  Bala claims $22,330.73 in fees to the Vogel Law Firm and $29,601.71 in fees to the DeMars & Turman law firm for a total of $51,932.44.  Additionally, Bala claims 12% interest on these fees from the date of breach in February 2004, which equals $84,224.03.  Altogether Bala claims $136,156.47 in fees and interest related to the lease litigation.

Trustee and PWE do not dispute that Bala incurred these fees or the
accuracy of her interest calculation.  They do dispute, however, that she is entitled
to her claim.  Trustee argues: (1) that Bala is not entitled to attorney fees for the
portion of the ligation regarding subordination of her breach of lease claim; (2) that
Bala's attorney fees claim is not allowable because they are post-petition attorney's
fees incurred by an unsecured creditor; (3) that Bala's fee claim is res judicata; and
(4) that the doctrine of laches bars Bala's claim.  PWE joins these arguments.  The
Court will address these arguments in turn.

### 1.  Fees Regarding Subordination

Trustee argues that, even if Bala is entitled to attorney fees under § 9.1 of the
lease, she is only entitled to fees "for recovery of possession. . . recovery of rent. . .
or because of the breach of any other covenant."  Trustee notes that the claim was
initially allowed, but subordinated, and that all but $1,500 of Bala's attorney fees
were incurred litigating the subordination issue, not the claim itself.  Therefore,
Trustee argues, Bala's fee claim should be limited to $1,500.

Bala responds that the terms of the lease provide that: "In the event suit shall
be brought. . . for recovery of rent or any other amount due under the provision of
this Lease, or because of the breach. . . Lessee shall pay to Lessor all expenses. . .
including reasonable attorney's fees. . .."  Bala argues that the inclusion of "for

recovery of rent" and "because of the breach" should be construed broadly to include fees incurred litigating the subordination issue.

In interpreting the lease agreement, the Court follows basic principles of contract interpretation. "If the language of the contract is clear and unambiguous, and the intent is apparent from its face, there is no room for further interpretation." Bendish v. Castillo, 812 N.W.2d 398, 403 (N.D. 2012) (citations omitted). "[A] court will give effect to all provisions of a contract and will harmonize the various provisions unless they are 'necessarily repugnant.'" W. Oil Fields, Inc. v. Pennzoil United, Inc., 421 F.2d 387, 389 (5th Cir. 1970)( citations omitted).

The broad phrases "recovery of rent" and "because of the breach" invite a broad reading. The Court finds that these phrases contemplate any action brought in pursuit of payment. In this case, had Trustee been successful in seeking subordination, it would likely have resulted in Bala receiving nothing on her breach of lease claim, at least as the case appeared at the time. In pursuing the subordination issue, Bala was pursuing payment. Attorney fees incurred as part of this effort are, therefore, recoverable under the plain language of the lease agreement. If the Court were to allow Bala's attorney fee claim, it would include fees incurred litigating the subordination issue.

### 2. Disallowance of Fees as Post-Petition Claims

Trustee argues that Bala's attorney fee claim is not allowable because the fees were incurred post-petition and Bala is an unsecured creditor. The Supreme Court addressed the issue of post-petition attorney fees by unsecured creditors in Travelers Cas. and Sur. Co. of Am. v. Pacific Gas and Elec. Co., 549 U.S. 443 (2007), but did not give clear guidance on the issue. Shortly after the Travelers decision, two bankruptcy courts issued diverging opinions on the issue. In re Elec. Mach. Enter., Inc., 371 B.R. 549 (Bankr. M.D.Fla. 2007) held that attorney's fees incurred by unsecured creditors post-petition **are not** allowable. Qmect, Inc. v. Burlingame Capital Partners II (In re Qmect, Inc.), 368 B.R. 882 (Bankr. N.D. Cal. 2007) found that such fees **were** allowable. The Ninth Circuit later adopted the Qmect approach in In re STNL Corp., 571 F.3d 826 (9th Cir. 2009).

The Eighth Circuit has not specifically ruled on this issue. Trustee urges this Court to follow the Elec. Mach. line of cases, while Bala argues for the Qmect and STNL line. Although they reach different conclusions, the two lines of cases address the same four arguments: (1) "whether section 506(b) operates to disallow such claims;" (2) "whether section 502(b) disallows such claims because they were not fixed 'as of the date of the filing of the petition;'" (3) "whether the Supreme Court's decision in United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365 (1988), precludes allowance of such claims;" and (4)

74

"whether public policy favors disallowance of such claims." STNL, 571 F.3d at 841. The Court will address each of these arguments.

### a. Section 506(b)

Section 506(b) states:

> To the extent that an allowed secured claim is secured by property the value of which. . . is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

11 U.S.C. § 506(b).

Section 506(b) provides that creditors with oversecured claims are allowed post-petition attorney fees but does not specifically address unsecured creditors. The Elec. Mach. line of cases reasons that § 506(b) provides an exception allowing post-petition attorney fee claims in the case of oversecured creditors, therefore, the general rule must be that all other creditors are not entitled to post-petition attorney fees. Elec. Mach., 371 B.R. at 551 ("[I]f Congress intended for unsecured creditors to receive post-petition attorneys' fees, then it would have done so explicitly by authorizing unsecured creditors to collect fees under section 506(b)"). The Qmect line of cases rejects this reasoning, arguing that § 506 is focused only on secured claims, therefore, its failure to address claims for post-petition attorney fees by unsecured creditors does not necessarily mean that those claims should be disallowed. STNL, 571 F.3d at 843.

As stated above, the Eighth Circuit has not ruled on this issue. The only guidance the Court has is a decision issued by the Eighth Circuit B.A.P. prior to the Travelers ruling. See In re Waterman, 248 B.R. 567, 573 (B.A.P. 8th Cir. 2000). The Waterman court stated:

> Debtor correctly asserts that generally, a creditor's claim is determined as of the date of the filing of the bankruptcy petition. . . and that amounts incurred post-petition are not usually permitted as part of the claim. On the other hand, however, if Ditto was oversecured, she is entitled under § 506(b) to reasonable fees, costs or charges provided for under the agreement with Debtor and can add post-petition attorneys' fees to her claim to the extent allowed by her agreement with Debtor and subject to court review for reasonableness.

Id. (citations omitted).

The parties' arguments regarding Waterman track other courts' discussions of post-petition attorney fees and § 506(b) generally. Trustee argues that the B.A.P.'s statement "generally, a creditor's claim is determined as of the date of the filing of the bankruptcy petition" sets out the general rule and that § 506(b) provides an exception in the case of oversecured creditors, therefore, post-petition claims by unsecured creditors should not be allowed. Id. Bala argues that Waterman, like § 506(b), only addresses oversecured creditors and that the Court should not infer anything about how claims by unsecured creditors should be treated when they are not directly addressed in Waterman or § 506(b).

The Court finds Trustee's reasoning more persuasive. Although neither § 506(b) nor Waterman directly addresses claims by unsecured creditors, the issue

is addressed implicitly by both.  Courts in the Elec. Mach. line have applied the

legal maxim "expressio unius est exclusio alterius" meaning that if one or more

things of a class are expressly mentioned others of that same class are exclude.

Elec. Mach., 371 B.R. at 553.  The Court finds this maxim appropriate in the

context of § 506(b).  That section expressly provides that post-petition attorney fee

claims are allowed for oversecured creditors.  Similar claims by unsecured

creditors must, therefore, not be allowed, otherwise there would be no reason for

Congress to include § 506(b).  The Court, therefore, finds Bala's claim for attorney

fees accrued litigating the breach of lease issue not allowable under § 506(b).

### b. Section 502(b)

While the determination under § 506(b) is dispositive—the fees are not

authorized—the Court will also address the other three arguments courts have

examined when ruling on whether to allow post-petition attorney fee claims by

unsecured creditors.  In 11 U.S.C. § 502(b), Congress provided that if "objection to

a claim is made, the court, after notice and a hearing, shall determine the amount of

such claim in lawful currency of the United States **as of the date of the filing of**

**the petition**. . .."  11 U.S.C. § 502(b) (emphasis added).  The Elec. Mach. line of

cases hold that attorney fee claims which arise post-petition do not exist "as of the

date of the filing of the petition" and therefore should not be allowable claims.

Elec. Mach., 371 B.R. at 551.  The Qmect line of cases takes a broader definition

of the word "claim." <u>SNTL</u>, 571 F3d at 843. The <u>Qmect</u> cases hold that "'[s]o long as the right to collect the fees existed pre-petition, the fact that the fees were actually incurred during the postpetition period is not relevant. . ..'" <u>Id</u>. (quoting <u>In re New Power Co.</u>, 313 B.R. 496, 508 (Bankr. N.D. Ga. 2004)). Again, Trustee argues for the <u>Elec. Mach.</u> line of cases while Bala argues for the <u>Qmect</u> line.

This Court basis its determination that Bala's claim for attorney fees related to the breach of lease litigation are disallowed primarily on the § 506(b) analysis above. The Court finds the <u>Elec. Mach.</u> reasoning in regard to § 502(b) persuasive. The language in § 502(b) stating that courts "shall determine the amount of such claim. . . as of the date of filing. . ." indicates that claims that arise after the petition date should be disallowed. The Court notes, however, that when a claim arises is not always a clear-cut question.

A "claim" includes any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured. . .." 11 U.S.C. § 101(5). The point at which a claim becomes a "claim" under the definition in § 101(5), when it comes into existence, impacts whether and how it is treated in bankruptcy. As a general rule pre-petition claims are treated in bankruptcy while post-petition claims are not. This question most commonly arises in cases involving environmental damage claims or products liability claims.

78

See In re Grossman's Inc., 607 F.3d 114 (3d Cir. 2010); Grady v. A.H. Robins Co.

Inc., 839 F.2d 198 (4th Cir. 1988); Epstein v. Official Comm. of Unsecured

Creditors or Estate of Piper Aircraft Corp., 58 F.3d 1573 (11th Cir. 1995); 995

F.2d 925 (9th Cir. 1993).  Various courts have established different tests to address

this question. Id.

　　　The present case does not require this Court to weigh in on the debate of

precisely when a "claim" comes into existence for the purposes of allowance under

§ 502(b).  The Court includes this discussion to make clear that its disallowance of

post-petition attorney fee claims by unsecured creditors should not be read to say

that any claim, the amount of which cannot be determined with absolute certainty

as of the date filing, should be disallowed.  There are certain claims, such as Bala's

indemnification claim[2] above, which are not fully matured as of the date of the

filing the petition but should be treated in the bankruptcy as pre-petition claims.

---

[2] Although neither PWE nor Trustee expressly argue that Bala's indemnification
fee claim should be barred as a post-petition attorney fee claim, as they argue for
her lease breach claim, the Court feels it is necessary to distinguish these two
claims in that regard.  Bala's indemnification claim is for attorney fees incurred in
an entirely separate criminal case outside this bankruptcy.  All the conduct at issue
in that criminal case occurred pre-petition.  Both these factors support the Court's
treatment of Bala's indemnification claim as a pre-petition claim.  Multiple courts
have found that indemnification claims are pre-petition claims, even if the claimant
did not incur the indemnified expense until after the bankruptcy petition was filed.
In re Food Barn Stores, Inc., 175 B.R. 723, 731 (Bankr. W.D. Mo. 1994); In Re
Mid-American Waste Systems, Inc., 228 B.R. 816, 821 (Bankr. D. Del. 1999); In
re Hemingway Transport, Inc., 954 F.2d 1, 8–9 (1st Cir. 1992).

### c. The Timbers Decision

The Supreme Court's decision in Timbers addressed the related issue of post-petition interest claims. See United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365 (1988). The Supreme Court found in Timbers that an oversecured creditor is entitled to post-petition interest under 506(b), but only to the extent that it is oversecured. Timbers 484 U.S. at 380. In other words, an oversecured creditor can be paid post-petition interest out of its "equity cushion," but once that equity cushion is exhausted, the creditor is not entitled to any additional post-petition interest. Id.

The Elec. Mach. line of cases reasons that the same rational the Supreme Court applied to post-petition interest in Timbers should be applied to post-petition attorney fees. The Qmect line holds that attorney fees are distinguishable from interest because § 502(b)(2) specifically disallows claims for "unmatured interest" but provides no such specific disallowance for attorney fees.

The Court finds the Elec. Mach. reasoning more persuasive. The logic the Supreme Court applied to post-petition interest in Timbers is the same logic Elec. Mach. applies to post-petition attorney fees. While the Court agrees with the Qmect line of cases that Timbers is not controlling on the issue of post-petition attorney fees, the Supreme Court's reasoning in Timbers tracks much more closely to Elec. Mach.'s application of § 506(b) to post-petition attorney fees than the

80

Qmect line's reasoning.  The Court finds that the Timbers ruling is informative on the issue of post-petition attorney fees and lends support to the Elec. Mach. line of cases.

### d. Public Policy Considerations

The two sides public policy arguments can be summed up fairly succinctly. The Qmect line of cases reason that it is unfair to allow debtors to recover post-petition attorney fees but not allow creditors to do the same.  SNTL, 571 F.3d at 845.  The Elec. Mach. line of cases reason that allowing unsecured creditors to continually add post-petition attorney fees to their claims prevents finality in the case, "[t]he 'cash registers' would ring on a daily basis."  Elec. Mach., 371 B.R. at 553.  These cases also warn that allowing post-petition attorney fee claims would incentivize unsecured creditors to purse excessive litigation, driving up the value of their claims with attorney fees and unnecessarily prolonging the case.  Id.

The Court acknowledges but does not base its decision on public policy considerations.  The plain language of the Code, specifically § 506(b), provides a sufficient basis to find that post-petition attorney fee claims by unsecured creditors are not allowable.  The Court therefore denies Bala's claim for post-petition attorney fees incurred pursuing her breach of lease claim against RSI.

### 3. Res Judicata

In addition to the arguments above, Trustee argues that Bala's claim for
post-petition attorney fee's is barred by the doctrine of res judicata. Trustee notes
that the parties have extensively litigated the underlying breach of lease claim in
this Court and higher Courts. Trustee argues that attorney fees are the same claim
or cause of action as the underlying claim and concludes that this previous
litigation was the proper time for Bala to seek attorney fees. Trustee argues that
Bala's failure to seek attorney fees during the course of the litigation on the
underlying breach of lease and subordination actions bars her from doing so now
under the doctrine of res judicata.

"The doctrine of res judicata. . . applies to final orders issued by bankruptcy
courts." In re Kana, 478 B.R. 373, 383 (Bankr. D. N.D. 2012). "The three-part
test courts apply when evaluating assertions of res judicata is: (1) whether the prior
judgment was entered by a court of competent jurisdiction; (2) whether the prior
decision was a final judgment on the merits; and (3) whether the same cause of
action and the same parties or their privies were involved in both cases.'" Id. at
384 (internal quotations omitted). "The parties are bound 'not only as to every
matter which was offered and received to sustain or defeat the claim or demand,
but as to any other admissible matter which might have been offered for that

purpose.'"  Id. (quoting Yankton Sioux Tribe v. U.S. Dep't of Health and Human

Servs., 533 F.3d 634, 640 (8th Cir. 2008).

When determining whether a suit is based upon the same cause of action,

courts will analyze whether the claim "arises out of the same nucleus of operative

facts as the prior claim."  Yankton Sioux Tribe, 533 F.3d at 641 (quoting Lane v.

Peterson, 899 F.2d 737, 742 (8th Cir. 1990)).  However, "res judicata does not

apply to claims that did not exist when the first suit was filed."  Ripplin Shoals

Land Co., LLC v. U.S. Army Corps of Eng'rs, 440 F.3d 1038, 1042 (8th Cir.

2006); see also Baker Grp., L.C. v. Burlington N. and Santa Fe Ry. Co., 228 F.3d

883, 886 (8th Cir. 2000).

Nevertheless, courts have found that "attorney's fees are part of the same

claim or cause of action as the underlying substantive claim."  Wicker v. Seterus,

Inc., 2016 WL 2622017 at *8 (W.D. Tex.).  Accordingly, courts have held that res

judicata bars an action for attorney fees where the plaintiff does not pursue

attorney fees in the first action.  Id. at *9 ("[B]ecause the issue of attorney's fees is

part of the same claim or cause of action as the breach of contract claim. . . the

fourth element of res judicata is met, despite the fact that neither Plaintiff nor Bank

of America chose to raise the issue. . .").

Bala agrees that the first two elements of res judicata are met but argues that

the third is not.  Bala argues that her claim for attorney fees is not "the same cause

83

of action" as the underlying breach of lease and subordination actions. Bala argues that her attorney fees claim did not arise until after she brought the underlying claim and so did not exist. Bala concludes that res judicata does not apply.

Bala notes that the Trustee's citations, which specifically find that "attorney's fees are part of the same claim or cause of action as the underlying substantive claim," are not bankruptcy cases. Bala argues that she brings this attorney fee claim as a general unsecured claim, whereas she sought the unpaid rent as an administrative expense. Bala argues that the doctrine of res judicata does not apply because she brought her action for fees under a different section with different proof requirements.

Here, the Court finds that the doctrine of res judicata bars Bala's attorney fee claim. The case law treats the attorney fee claim as a part of "the same cause of action" as the underlying claim. The Court rejects Bala's arguments otherwise. First, the Court rejects Bala's argument that her claim to attorney fees arose only after the litigation was complete. Although Bala is correct that she did not know how much her attorney's fees would be, she nevertheless could have pled them along with the underlying cause of action. Bala had a claim to future attorney fees, however uncertain, as a part of the lease when she brought her original claim. She could and should have pursued an award of attorney fees along with that litigation. Second, the fact that these are not bankruptcy cases is irrelevant. Bala has not

84

shown why this authority does not apply in the bankruptcy context. Although Bala is correct that she now brings the claim as a different priority claim, she presents nothing to show why that should change the result in this case. Thus, the Court follows the clear case authority and finds that res judicata bars Bala's claim for attorney fees based on her breach of lease claim.

### 4. The Doctrine of Laches

Finally, Trustee argues that the Court should deny Bala's lease fee claim based on the doctrine of laches. The Court disagrees for the same reasons discussed above in regard to Bala's indemnification fee claim. To successfully assert the doctrine of laches, the party asserting it must show: (1) a delay in asserting a right or a claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted. Roederer v. J. Garcia Carrion, S.A., 569 F.3d 855, 859 (8th Cir. 2009).

Bala's delay and lack of explanation for her delay is not enough to show that laches applies. Although Trustee alleges that he is prejudiced because he is attempting "to efficiently administer the estate and eleventh-hour claims, such as these made by Ms. Bala, prevent the Trustee from doing so," that allegation alone is insufficient. No doubt, this case has proceeded for some time, but the posture of this case is not "eleventh hour." The claims litigation in this case has continued to the present after the posture of this case has changed multiple times. The Court is

not only addressing Bala's claims in this ruling, but other parties' claims as well.
There is nothing in the record to show that Bala's delay in amending her claim to
add the lease fee claim prejudiced Trustee or any other party.  Trustee's argument
that laches should apply rests on nothing more than "the mere passage of time."

The Court finds that Bala has a valid claim for attorney fees under the lease
agreement, but that her claim is not allowable under the Code because it is a post-
petition attorney fee claim by an unsecured creditor.  Even if Bala's claim were so
allowable, the Court finds that it would be barred by the doctrine of res judicata.

### C. Life Insurance Policy

As a benefit of her employment with RSI, Bala was the beneficiary of a life
insurance policy with Guardian.  The face value of that policy was $1,000,000.
This policy involved two interrelated documents.  There was the insurance policy
itself (the "Insurance Policy") and the split-dollar life insurance agreement (the
"Life Insurance Agreement").  Under the Life Insurance Agreement, RSI was
responsible for paying the premiums on the Insurance Policy.  Under the terms of
the Life Insurance Agreement, in the event of Bala's death, upon the payout of the
benefit, Bala's estate would reimburse RSI for all premium payments made into
the policy, as long as the policy was still in effect.

In 2004, sometime after RSI filed bankruptcy, RSI stopped paying the
premiums on the Insurance Policy.  Nevertheless, for some time after that,

Guardian continued the policy, automatically deducting payments out of the cash value of the policy. At some point this also stopped.

As a part of the criminal forfeitures entered against Bala and RSI, Guardian sent a letter and a check for $64,000, which was the outstanding cash value of the Insurance Policy, to the United States' Department of Justice (the "DOJ"). Bala received a letter from Guardian letting her know that she could reinstate the policy if she paid the outstanding premium payments. After the Eighth Circuit Court of Appeals reversed the convictions and accompanying forfeiture orders, the DOJ returned the $64,000 to Guardian. Guardian informed Bala that if she paid $6,074.01 in unpaid premiums, she could reinstate the policy. She did not do so. In 2009, Bala could have reinstated the policy if she paid about $28,000 in unpaid premiums. She did not do so.

Then, in 2009, Guardian "sought to interplead the cash value of the policy [about $64,000] in the bankruptcy case, deliver the funds to the bankruptcy court, and limit its involvement or future liability." In re Racing Servs., Inc., 744 F.3d 543, 547 (8th Cir. 2014). The Bankruptcy Court allowed Guardian to deposit the funds over Bala's objection and Trustee filed an adversary "to determine if the deposited funds from the insurer were property of the estate." Id. This adversary eventually went to the Eighth Circuit. Id.

87

In ruling on this adversary, the Eighth Circuit addressed whether RSI's bankruptcy estate or Bala was "entitled to the liquidation proceeds of a cash-value life insurance policy the employer purchased for her." Id. The Court found that "the terms of an agreement between Bala and her employer grant[ed] the employer only the limited right to receive a repayment of policy premiums from the cash value upon surrender of the policy by Bala" and that "Bala at no time surrendered the policy." Id. Accordingly, the Court concluded, "the estate did not possess a right to control the policy or receive its liquidation proceeds" and awarded the proceeds to Bala. Id. Based on this ruling, Bala received the cash surrender value of the Guardian policy, which was about $64,000.

Bala now claims $1 million in damages for RSI's purported breach of the Life Insurance Agreement. Bala argues that she lost the Insurance Policy because RSI stopped paying the premiums and that this constituted a breach of the Life Insurance Agreement. Bala claims that she is entitled to the face value of the policy as damages for this breach.

Trustee and PWE object to Bala's claim. PWE argues that Bala has failed to show any breach on RSI's part. PWE acknowledges that Trustee stopped paying the policy premiums but argues that this was not a breach because RSI was not obligated to continue payments once Bala was no longer an employee. PWE and Trustee also argue that Bala failed to mitigate her damages by paying the

premiums or purchasing a new policy.  They argue that Bala had the means to pay
the unpaid premiums but chose to pay her attorneys instead of paying the
premiums to reinstate the policy.  They conclude that her failure to mitigate her
damages by paying these premiums bars her recovery.

As explained below, the Court finds that Bala has failed to show that RSI
breached the Life Insurance Agreement or that the alleged breach led to the
surrender of the policy.  The Court also finds that, even if Bala had shown that RSI
breached the Life Insurance Agreement and caused the surrender of the policy,
Bala failed to mitigate her damages by paying the unpaid premiums on the policy.

### 1.  Breach by RSI

Bala argues that Trustee caused RSI to breach the Life Insurance Agreement
and caused the policy to be canceled.  She argues that, under the Life Insurance
Agreement, RSI had the duty to pay the premiums on the Insurance Policy.  She
argues that RSI breached this agreement when it stopped paying the premiums on
the policy.  She argues that, if this breach had not happened, she would have been
able to grow the policy and enjoy its benefit.  She argues that, even though she
stopped working for RSI, she continued to own the policy and should have had the
opportunity to keep the policy.  She notes that the Eighth Circuit specifically
recognized that possibility: "For example, upon ending employment in the normal
course of events, Bala would enjoy the ability to remain insured by paying

89

premiums through the automatic loan provisions, or through any other means." <u>In re Racing Servs., Inc.</u>, 744 F.3d at 552.

In her briefs, Bala asserts that it is undisputed that RSI breached the Life Insurance Agreement and caused the policy to be canceled.  Bala's Reply on Her Claim, Doc. 900 at 9 (citing Post-Trial Brief Following Claims Hearings Held on January 16-19, p. 13, <u>In re Racing Servs., Inc.</u>, No. 04-30236 (Bankr. D.N.D. Mar. 5, 2018)) ("The Trustee also acknowledges that the Insurance Policy was cancelled due to a breach of the Life Insurance Agreement.").  Trustee does not directly address the issue of breach of the Life Insurance Agreement.  Trustee acknowledges that RSI had a duty to pay the premiums on the policy but argues that it is unclear how long RSI had the duty to do so.  In any event, Trustee's arguments are almost exclusively about Bala's damages from the alleged breach.

PWE, however, does assert that Bala has not shown that RSI breached a duty owed to her.  PWE acknowledges that Trustee stopped paying the policy premiums but argues that this failure does not constitute a breach.  PWE argues that RSI's duty to continue making premium payments ended when Bala was no longer working for RSI.

Bala claims that it is undisputed that RSI breached the agreement because "the Eighth Circuit has already determined that '[n]otwithstanding Bala's presently recognized right to obtain the policy's liquidation proceeds, the actions of the

90

terminating party deprived her of her insurance death benefit.'" Doc. 900 at 9

(quoting In re Racing Servs., Inc., 744 F.3d at 553).  Bala makes much of the

Eighth Circuit's ruling—arguing that language in the ruling effectively established

RSI's liability for breaching the Life Insurance Agreement and causing the

Guardian policy to be canceled.  On that basis, she concludes that "PWE's

arguments regarding liability are not applicable and the only issue in dispute is a

calculation of Ms. Bala's damages and whether she satisfied her duty to mitigate."

Doc. 900 at 9.  Thus, Bala's position is that the Eighth Circuit established breach

on the part of RSI such that the Court need not address this issue.

Bala's reliance on the Eighth Circuit's ruling is misplaced.  The Eighth

Circuit ruling did not establish liability for the policy's cancelation against RSI.

Although Bala is correct that the Eighth Circuit recognized that the Guardian

policy had value to her, aside from just the cash surrender value, and that she was

deprived of that value, it did not identify RSI as "the terminating party." In re

Racing Servs., Inc., 744 F.3d at 552 ("Notwithstanding Bala's presently recognized

right to obtain the policy's liquidation proceeds, the actions of the terminating

party deprived her of her insurance death benefit.").  Indeed, the Eighth Circuit

wrote, "[I]t is clear to our court that **the policy was terminated** in an inequitable

manner without court approval **at the apparent behest of the DOJ which**, at the

time, **had** the duty to preserve the policy but **not the right to cancel it.**" In re

91

Racing Servs., Inc., 744 F.3d at 553 (emphasis added).  Later however, the DOJ

returned the cash value of the policy to Guardian, which "then notified Bala that

she could reinstate the policy with proof of insurability and repayment of about

$6,000 in overdue premiums."  Id. at 546.  Bala did nothing, however, and then in

2009, Guardian came to this Court and asked to deposit the funds into the

bankruptcy estate.  The Court approved deposit of the money.  Since that time,

there has been no opportunity to reinstate the policy.

Thus, the policy was wrongfully terminated or surrendered at the request of

the DOJ as a part of the criminal forfeiture order.  In re Racing Servs., Inc., 744

F.3d at 546, 553.  RSI did not terminate the policy.  Although the Eighth Circuit

ruling certainly establishes that the Guardian Policy was wrongfully terminated,

and that Bala lost the death benefit that she was entitled to, it does not establish

that RSI is liable for that loss.  Thus, the Eighth Circuit ruling does not establish

that RSI breached any agreement with Bala or otherwise caused the policy to be

surrendered.

Bala argues that RSI breached the agreement by not paying the premiums.

In her amended claim, Bala states, "Under the terms of the split dollar agreement

[the Life Insurance Agreement], RSI was obligated to keep the life insurance

policy in force.  That agreement was breached when RSI failed to pay the

premiums on the policy."  Bala's Amended Claim 40-3.  Bala does not explain her

position further than this.  The Court understands her position to be that RSI had a duty to pay the premiums at least beyond the point that it did.  Bala makes no argument about when—if ever—RSI's duty to pay the premiums terminated.

The Life Insurance Agreement itself states, "[A]s long as this assignment is in force, [RSI] will advance to [Bala] each year as the premium on the Policy becomes due, [Bala's] payment. . .."  RSI stopped making payments on the policy in 2004, when RSI filed this case.  Bala argues that, under the terms of the Life Insurance Agreement, RSI was required to continue to advance the premiums beyond the point that it did.  She concludes that RSI's cessation of payments breached the Life Insurance Agreement.

The core of this dispute is how long RSI had a duty to continue to make payments.  The Life Insurance Agreement itself provides that RSI will pay the premiums as they become due "as long as this assignment is in force."  The Life Insurance Agreement also provides, however, that the agreement could be terminated.  In Paragraph 8 it provides that, "[I]f this agreement is terminated" Bala would have the option to pay back to RSI the premiums it had paid and receive RSI's interest in the life insurance policy.  In re Racing Servs., Inc., 744 F.3d at 546.  The agreement itself does not provide for how it could be terminated or what events expressly constitute termination.  Presumably, because it was a part of Bala's benefits as an employee of RSI, cessation of Bala's employment would

93

terminate the agreement.  This is consistent with the Eighth Circuit's

understanding of the Life Insurance Agreement: "In the event of a termination due

to Bala's departure from employment with Racing Services. . .."  In re Racing

Servs., Inc., 744 F.3d at 552.  Likewise, the Eighth Circuit posited certain events

that may have terminated the agreement: "By specifically providing for rights only

in the event of a surrender by Bala, and not for a surrender generally or for some

other type of triggering event (such as termination by a court, the DOJ, the insurer,

or the Trustee for the employer). . .."  Id. at 550.  Thus, it appears from the Eighth

Circuit's ruling that, in the "bizarre course of events" of this case, any of those

actors potentially terminated the Life Insurance Agreement.  Id. at 551.

Thus, the core of this issue is who terminated the agreement and when that

termination occurred.  Bala argues that RSI stopped making premium payments

before the agreement terminated.  It is otherwise unclear when Bala believes the

agreement terminated.  PWE and Trustee argue that the agreement terminated

when Bala stopped working for RSI in 2004.

Bala has the burden to show that RSI breached the agreement.  She has not

done so.  It is clear that RSI had a duty to pay premiums until the agreement

terminated.  It is unclear, on this record, when the agreement terminated, and this

duty ended.  In the Court's view, the most likely point seems to be when Bala

stopped working for RSI sometime in 2004.  The Court, however, does not need to

determine precisely when the Life Insurance Agreement terminated.  Bala, as the claimant, has the burden to show duty, breach, and causation.  Bala has shown that RSI had a duty at one point in time, but she has not shown breach.  Bala simply asserts that the agreement required RSI to pay the premiums, which is undisputed, and that RSI stopped paying the premiums, which is also undisputed.  This only constitutes a breach if Bala can show that the Life Insurance Agreement had not yet terminated when RSI ceased making payments.  Bala simply does not address the issue of when the agreement terminated.

Even if Bala had shown breach, she cannot show causation.  The Court finds that RSI's purported breach did not cause Bala to lose the insurance policy.  Bala continued to own the Insurance Policy after RSI stopped paying the premiums. She continued to own the policy until it was surrendered to the DOJ as a part of the criminal forfeiture order in 2007.  Thus, the intervening action by the DOJ in causing the Guardian policy to be surrendered is what caused Bala to lose the policy.  RSI's failure to continue premium payments before that could result in, at most, damages for the amount of unpaid premiums.

The Court finds that Bala failed to meet her burden to show that RSI breached the Life Insurance Agreement.  Even if she could show that RSI breached the Agreement, she failed to show that that breach caused her to lose the policy.

## 2. Failure to Mitigate

Even if RSI had breached the Life Insurance Agreement and caused Bala to lose the policy, the Court would find that she failed to mitigate her damages. The parties agree that North Dakota law "imposes an obligation on injured parties to take reasonable steps to limit their damages if they can do so through reasonable exertion or at a trifling expense." Peterbilt of Fargo, Inc. v. Red River Trucking, LLC, 864 N.W.2d 276, 281–82 (N.D. 2015) (collecting cases). Failure to mitigate damages is an affirmative defense and the burden is on PWE and Trustee to prove that Bala failed to mitigate. Ford v. GACS, Inc., 265 F.3d 670, 679 (8th Cir. 2001) ("Because mitigation of damages is an affirmative defense, GACS bears the burden of establishing that Ford could have lessened his damage."); see also Lochthowe v. C.F. Peterson Estate, 692 N.W.2d 120, 127–28 (N.D. 2005).

PWE and Trustee argue that Bala failed to mitigate her damages. They argue that Bala had the opportunity and ability to pay the unpaid premium and reinstate the Guardian policy in 2007 when she could have reinstated the policy for about $6,000 and again in 2009 for about $28,000. They argue that Bala chose to pay other expenses instead of paying to reinstate the Insurance Policy. They also argue that she could have and should have sought to obtain another insurance policy. They conclude that, because she did not take these actions to mitigate her damages, she is not entitled to damages for RSI's purported breach.

96

Bala argues that she did not have the means to pay the premiums. After her release from prison, Bala argues that she did not have the lump sum to reinstate the Guardian policy in 2007, 2009, or anytime in between. Bala also argues that age and health are the primary factors insurance companies look at when deciding to underwrite a policy. She argues that she would have been unable to obtain a life insurance policy at the same rate because of her intervening medical diagnoses.

The Court finds that Bala failed to mitigate her damages by not reinstating the policy when she had the opportunity. Although it is clear that Bala was unable to pay the premium when she was released from prison, she later obtained income of about $50,000 a year. For two years, she had the opportunity to reinstate the policy, but did not do so. Given the fact that she values the policy at $1 million, the amount needed to cover the premiums (between $6,000 to $28,000 during that period) should have been worth the expense. Moreover, she was able to pay other substantial expenses, like her attorney's fees, during this time.

Bala had "a duty to take reasonable efforts to mitigate damages." Robbins v. Farmers Union Grain Terminal Ass'n, 552 F.2d 788, 797 (8th Cir. 1977). In this case, that reasonable effort meant paying the unpaid premiums to reinstate the policy. The record is clear that she was financially able to reinstate the policy before it was finally surrendered in 2009. Had she done so, she would now enjoy the Guardian policy's death benefit that she seeks from RSI. The Court finds that

Bala failed to mitigate her damages.  Accordingly, even if she had shown that RSI breached the Life Insurance Agreement and caused her to lose the policy, she would still not be entitled to damages because she failed to mitigate those damages by paying the unpaid premiums between 2007 and 2009.

The Court concludes that Bala has not met her burden to prove up her claim for breach of the Life Insurance Agreement and failed to mitigate damages from that alleged breach.  The Court denies Bala's $1 million breach of contract claim based on the Life Insurance Agreement.

## CONCLUSION

**WHEREFORE**, PWE's original claim for $2,248,100.86 is ALLOWED.

**FURTHER**, PWE's amended claim adding $10,851,553.12 for the unauthorized taxes assessed on its account wagering activity through RSI is DENIED.

**FURTHER**, Carlson's $380,848.44 claim for the unauthorized taxes assessed on his account wagering activity through RSI is DENIED.

**FURTHER**, Bala's $167,437.71 claim for indemnification for her criminal defense legal fees is ALLOWED.

**FURTHER**, Bala's $136,156.47 claim for legal fees accrued during the litigation over the breach of lease claim is DENIED.

**FURTHER**, Bala's $1,000,000 claim for loss of her life insurance policy is
DENIED.

Dated:  November 28, 2018

_____
Thad J. Collins
United States Bankruptcy Judge
Sitting by Designation